```
 1                    UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
 2                         TAMPA DIVISION

 3


 4
    UNITED STATES OF AMERICA,    )
 5                               )   8:18-cr-00594
              PLAINTIFF,         )   Tampa
 6                               )   August 7, 2019
              v.                 )   8:33 a.m.
 7                               )
    EMIRO HINESTROZA-NEWBBOOLL,)
 8  ET AL.,                      )
                                 )
 9            DEFENDANTS.         )

10

11

12

13

14             TRANSCRIPT OF SENTENCING HEARING
           BEFORE THE HONORABLE SUSAN C. BUCKLEW
15          UNITED STATES SENIOR DISTRICT JUDGE

16

17

18

19

20

21
    Court Reporter:           Tracey Aurelio, CRR, RMR, RDR
22                            Federal Official Court Reporter
                              801 N. Florida Avenue, 2nd Floor
23                            Tampa, Florida 33602
                              (813)301-5380
24
              Proceedings recorded by mechanical stenography,
25  transcript produced by computer.
```

```
 1   APPEARANCES:

 2   For the Government:
          MR. NICHOLAS DeRENZO
 3        United States Attorney's Office
          Suite 3200
 4        400 N. Tampa Street
          Tampa, FL 33602-4798
 5
     For Defendant Meighan:
 6        MR. DAVID ALAN DEE
          Law Offices of David A. Dee, PA
 7        311 S. Brevard Avenue
          Tampa, FL 33606
 8
     For Defendant Newball May:
 9        MR. BJORN ERIK BRUNVAND
          Bjorn E. Brunvand, PA
10        615 Turner Street
          Clearwater, FL 33756
11
     For Defendant Reid-Dilbert:
12        MR. PEDRO AMADOR, JR.
          Law Office of Pedro Amador, Jr.
13        Suite 925
          2203 N. Lois Avenue
14        Tampa, FL 33607

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2

 3  TIMOTHY CAMPBELL
       Direct Examination (Mr. DeRenzo)              46
 4     Cross-Examination (Mr. Dee)                   61
       Cross-Examination (Mr. Brunvand)             65
 5     Cross-Examination (Mr. Amador)               67

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1  _____

2         (Proceedings commenced at 8:33 a.m.)

3              THE COURT:  Good morning.

4         We have three matters set for sentencing this

5  morning, all the same case number.  The case number is

6  18-cr-594.  The Defendants' names are Rudolph Randolph

7  Meighan, Jorge Ramon Newball May, Calbot Reid-Dilbert.  So let

8  me begin by asking the courtroom deputy to swear the

9  interpreter.

10             THE COURTROOM DEPUTY:  Yes, Your Honor.

11        (Interpreter sworn.)

12             THE INTERPRETER:  James Plunkett, Spanish

13 interpreter.  Good morning.  And good morning, Your Honor.

14             THE COURT:  Good morning.

15             And if counsel will state their appearances.  And

16 we'll start with first counsel for the United States.  And

17 please tell me who is at counsel table with you.

18             MR. DeRENZO:  Good morning, Your Honor.  Nicholas

19 DeRenzo for the United States.  And seated to my left at

20 counsel table is Special Agent Tim Campbell with Homeland

21 Security Investigations.

22             THE COURT:  Good morning.

23             Mr. Dee.

24             MR. DEE:  Good morning, Your Honor.  David Dee here

25 on behalf of Defendant Rudolph Randolph Meighan.
```

```
 1              THE COURT:  Mr. Brunvand.

 2              MR. BRUNVAND:  Good morning, Your Honor.  Bjorn

 3   Brunvand on behalf of Defendant Jorge Ramon Newball May.

 4              THE COURT:  And Mr. Amador.

 5              MR. AMADOR:  Good morning, Judge.  Pedro Amador on

 6   behalf of Mr. Reid-Dilbert.

 7              THE COURT:  Okay.  I had -- these were all set for

 8   sentencing at 8:30, and I thought it was probably best to

 9   bring everyone in because most of the objections are

10   objections that you all maintain.  So if there are different

11   arguments, it would probably be best that I hear them all.

12   And I don't want to make one ruling and then come along and

13   find out that I should or would make a different ruling for

14   someone else.  So it's just better to do this all at once.

15              So let me begin by swearing the Defendants.

16              Mr. Meighan, would you stand, please.

17              And, Ms. Saylor, would you swear him in.

18         (Defendant Meighan sworn.)

19              THE COURT:  Sir, would you state your name.

20              DEFENDANT MEIGHAN:  Rudolph Meighan.

21              THE COURT:  Mr. Meighan, I have in front of me a

22   pre-sentence report.  Mine is dated July 31.  I have read it.

23   Have you read through and/or been over this report with your

24   attorney, Mr. Dee?

25              DEFENDANT MEIGHAN:  No, Your Honor.
```

```
1              THE COURT:  Okay.  Mr. Dee?

2              MR. DEE:  Your Honor, maybe there is some confusion.

3              But, Mr. Meighan, you don't recall reviewing this

4   report with me at the jail?  You don't recall doing that?

5              May I have a minute, Your Honor?

6              THE COURT:  Sure.

7              (Attorney-client conference.)

8              MR. DEE:  Okay, Your Honor.  He advised me of another

9   point he wanted to point out that he wanted me to challenge on

10  the report.  I think he understands now, if you want to ask

11  him the question if he actually reviewed this report.

12             THE COURT:  Okay.  My question is simply have you

13  read that report, been over that report with Mr. Dee?

14             DEFENDANT MEIGHAN:  Yes, ma'am.

15             THE COURT:  I'm not really asking about the

16  objections right now.  Just have you read through it?

17             DEFENDANT MEIGHAN:  Yes, ma'am.

18             THE COURT:  Are you taking any medicine of any kind

19  this morning?

20             DEFENDANT MEIGHAN:  No, ma'am.

21             THE COURT:  Thank you, sir.  You may have a seat.

22             Mr. Newball May, if you would stand, please.

23             And, Ms. Saylor, would you swear him in.

24        (Defendant Newball May sworn.)

25             THE COURT:  Sir, would you state your name?
```

1          DEFENDANT NEWBALL MAY:  Jorge Newball May.

2          THE COURT:  All right.  Mr. Newball May, in the past

3     24 hours, have you had any medicine?

4          DEFENDANT NEWBALL MAY:  Yes, Your Honor.

5          THE COURT:  What are you taking, or what are you

6     taking it for?

7          DEFENDANT NEWBALL MAY:  I'm taking pills for pain and

8     antibiotics.

9          THE COURT:  Okay.  Pain?  Where is your pain?

10         DEFENDANT NEWBALL MAY:  In my back and my legs.

11         THE COURT:  Okay.  Give me just a second here.

12         All right.  The only thing I have in the pre-sentence

13    report is Ibuprofen.  Do you know what you are taking for your

14    pain?

15         DEFENDANT NEWBALL MAY:  Ibuprofen.

16         THE COURT:  Thank you.  Have you been over the

17    pre-sentence investigation report, that was filed by the

18    probation officer, with your attorney?

19         DEFENDANT NEWBALL MAY:  Yes, Your Honor.

20         THE COURT:  Okay.  Do you need any more time to speak

21    with him before we start?

22         DEFENDANT NEWBALL MAY:  No.

23         THE COURT:  Okay.  Thank you, sir.  You may have a

24    seat.

25         Mr. Reid-Dilbert, would you stand, sir.

 1              And, Ms. Saylor, would you swear him in.

 2         (Defendant Reid-Dilbert sworn.)

 3              THE COURT:  Would you state your name, sir.

 4              DEFENDANT REID-DILBERT:  Reid-Dilbert, Calbot.

 5              THE COURT:  All right.  In the past 24 hours, have

 6    you had any medicine?

 7              DEFENDANT REID-DILBERT:  Yes, ma'am.

 8              THE COURT:  What are you taking medicine for?

 9              DEFENDANT REID-DILBERT:  High blood pressure and my

10    heart.

11              THE COURT:  Anything else?

12              DEFENDANT REID-DILBERT:  No, ma'am.

13              THE COURT:  I have in front of me a pre-sentence

14    report.  I have read it.  Have you been over this report with

15    your attorney?

16              DEFENDANT REID-DILBERT:  Yes, ma'am.

17              THE COURT:  Do you need any more time to talk with

18    him before we start?

19              DEFENDANT REID-DILBERT:  No, ma'am.

20              THE COURT:  Okay.  Thank you.  You may have a seat.

21              Let me begin with a question that I have.  Most of

22    the objections are the same to the guideline calculations.  I

23    do have one question, but perhaps I should go through what the

24    pre-sentence report says first.

25              The probation officer has done an advisory guideline

1    calculation and has suggested the following.  And I will start

2    with Mr. Meighan.  She has suggested that the base offense

3    level is a 38.  She has suggested that safety valve applies,

4    and there's two levels off as a result of the safety valve.

5    She suggested it appropriate there be a two-level increase for

6    obstruction of justice, and this has to do with jettisoning

7    and sinking the cocaine, and that there is nothing off for

8    acceptance of responsibility.  And under those guidelines, the

9    total offense level is a 38, and the criminal history category

10   is a 1.

11          The Government has filed, in Mr. Meighan's case, a

12   sentencing memorandum, and the Defense has filed a sentencing

13   memorandum.  There are objections to those guidelines by --

14   well, according to the addendum, objections by the Defendant

15   to the base offense level, to the fact that he didn't get any

16   minor role reduction, to the two-level increase for

17   obstruction of justice, and an objection based on the fact

18   that he didn't get acceptance of responsibility.

19          The Government, although apparently is not raising it

20   with the probation officer for some reason, has filed a

21   sentencing memorandum in which it objects to the safety valve.

22          With respect to Mr. Newball May, his objections are a

23   little different.  Although neither the Government nor the

24   Defendant submitted any objections to the guideline

25   calculations -- and I should say the guideline calculations as

1  it relates to Mr. Newball May, the base offense level is the

2  same; however, there's nothing for the safety valve.  There is

3  no decrease for the safety valve.  There's a two-level

4  increase for the obstruction of justice.  And the total

5  offense level is a 40.

6          And in the sentencing memorandum filed by Mr. Newball

7  May -- and I'm just going to read what it says here.  "I would

8  adopt the arguments set forth by co-Defendant Calbot

9  Reid-Dilbert as it relates to obstruction and minor role

10 request.  The Defendant cannot adopt the safety valve request

11 since he maintains his innocence.  Further, since he maintains

12 his innocence, he does not agree with the facts as set forth

13 in the pre-sentence investigation report."

14         Finally, Mr. Calbot Reid-Dilbert has also filed a

15 sentencing memorandum which I have read.  The guideline

16 calculations with respect to Mr. Calbot Reid-Dilbert are the

17 following.  There's minor differences.  Mr. Calbot

18 Reid-Dilbert, the base offense level is the same, 38.

19 However, it is recommended that he get a two-level decrease

20 for the safety valve.  He also is recommended a two-level

21 increase for obstruction of justice and nothing for the

22 acceptance of responsibility.  So a total offense level of a

23 38.

24         Again, according to the addendum, the Government has

25 no unresolved objections, although apparently they did have an

1  objection that they raised in their sentencing memorandum.

2  There is an objection by Mr. Reid-Dilbert to not getting a

3  minor role.  There is also an objection to the base offense

4  level.  And unless there's something else raised in the

5  sentencing memorandum, that's it.  And let me just go through

6  this a minute.  Minor role objection.  So the objections are a

7  little different.

8          So with that said, I have a question for the

9  probation officer to start with.  And I'm not quite sure I

10 understand the recommendations in the guideline calculations.

11 You suggested, as far as Mr. Meighan and Mr. Reid-Dilbert,

12 that they should get the safety valve.

13         PROBATION OFFICER:  Yes, Your Honor.

14         THE COURT:  And what's basis of that objection?

15         PROBATION OFFICER:  When probation spoke with the

16 United States Government about the qualifications for safety

17 valve and them debriefing --

18         THE COURT:  And when you say "Government," who are

19 you talking about?

20         PROBATION OFFICER:  Mr. DeRenzo.  I spoke with

21 DeRenzo.

22         THE COURT:  Okay.

23         PROBATION OFFICER:  He stated that they debriefed one

24 Defendant.  I can't quite remember.  He stated he didn't think

25 he fully debriefed or truthfully fully debriefed, but he

1  stated that both of these Defendants debriefed.  That's why

2  the office applied safety valve.

3          THE COURT:  And with respect to the one that didn't

4  get it, he said he didn't debrief?

5          PROBATION OFFICER:  Yes.  Yes.  And I think that one

6  was Newball May.

7          THE COURT:  Yes.

8          PROBATION OFFICER:  Yes, Your Honor.

9          THE COURT:  All right.  Thank you.

10         Then perhaps, Mr. DeRenzo, I should start with you

11 because this makes your sentencing memorandum a little

12 strange.  And I'm reading from your sentencing memorandum.

13 You didn't make an objection to the guidelines, which if you

14 had an objection that's where it should have been made, but it

15 says, "In addition to the issues detailed above, the United

16 States objects to the two-level downward adjustment and

17 application of the safety valve for purposes of disregarding

18 the statutory minimum penalty.  The United States contends it

19 has a good reason to believe that all three Defendants have

20 failed to meet the criteria set forth in 5C1.2(a)(5) and

21 18 United States Code Section 3553(f)(5).  That is they have

22 not completely and truthfully provided the information."

23         So I'm sort of puzzled why you would say one thing to

24 the probation officer and why you would say something else.

25 And then really it's not the statutory mandatory minimum

```
 1   penalty that's in play here really.  It's the two-level
 2   decrease.  Because unless I vary substantially, they are not
 3   anywhere near the statutory mandatory minimum.  So I, quite
 4   frankly, don't understand.
 5          MR. DeRENZO:  I will start procedurally, Your Honor.
 6   The initial pre-sentencing reports did not include the safety
 7   valve adjudgment.  So we did not file an objection to it.
 8          When I spoke with probation to reconcile the two
 9   things, it's true that they debriefed.  I hadn't had an
10   opportunity to fully examine whether or not they were complete
11   and truthful.  After having done that and spoken with the lead
12   case agent, including about follow-up debriefs that were
13   conducted in the case of Mr. Meighan, it's my position that
14   they weren't completely truthful.  Although they did talk to
15   the agents, their obligation under the safety valve provision
16   is to a hundred percent truthfully and fully debrief.
17          THE COURT:  So let me just see.  Are you talking
18   about debriefing after the trial or before the trial?
19          MR. DeRENZO:  In the case of Mr. Reid-Dilbert, he did
20   sit down and talk to the agents before trial.  In the case of
21   Mr. Meighan, both before and after he participated in
22   interviews with case agents.
23          THE COURT:  So he debriefed again after trial.
24          MR. DeRENZO:  That's correct, Your Honor.
25          THE COURT:  All right.  And so the probation officer
```

1  called you.

2      You called him before the initial or after the

3  initial?

4      PROBATION OFFICER:  After the initial to resolve some

5  of his objections.

6      THE COURT:  Okay.

7      PROBATION OFFICER:  Initially a new officer did the

8  pre-sentence reports, and there were substantial objections.

9  So I picked the reports up, if that makes sense.  So I called

10  him to resolve some of the objections.

11      THE COURT:  After the initial?

12      PROBATION OFFICER:  Yes, Your Honor.

13      THE COURT:  And the initial, I don't read the

14  initial.  So the initial didn't have the safety valve.

15      PROBATION OFFICER:  No, Your Honor.  No, it did not.

16      THE COURT:  And so it was after talking to him and he

17  saying they debriefed --

18      PROBATION OFFICER:  Yes, Your Honor.

19      THE COURT:  -- that you applied it.

20      PROBATION OFFICER:  Yes, Your Honor.

21      THE COURT:  And now you changed your mind.

22      MR. DeRENZO:  No, Your Honor.  I mean, that's

23  accurate.  They did debrief.  What I --

24      THE COURT:  Well, but she's asking about the safety

25  valve, I mean, obviously.

1          MR. DeRENZO:  I don't recall the entire substance of

2     our conversation.  But if memory serves and what I normally

3     say is they debriefed.  I haven't had a chance to evaluate

4     whether they have satisfied the fifth criteria because

5     oftentimes I need to get all the information, including

6     follow-up interviews.  And I'm not on the boat.  I'm not there

7     in Cartagena.  So sometimes the information I get later can

8     resolve a concern I might have on a previous interview about

9     whether or not they were telling the truth.  And so oftentimes

10     I'm not able to make that determination until later in the

11     game.

12          THE COURT:  What's the good of having a pre-sentence

13     report then if you can't make that determination?  I mean, the

14     whole purpose of these objections is to let the probation

15     officer weigh in and to give me some notice.  And to file a

16     sentencing memorandum where you raise it is really not

17     appropriate.  That's why we have the local rule that says what

18     it says.

19          MR. DeRENZO:  It does, Your Honor.

20          THE COURT:  Well, we are where we are.  All right.

21          So let's start with Mr. Meighan.  Mr. Meighan was a

22     situation where, apparently, there was no safety valve

23     recommended in the initial.  Mr. Meighan was somebody that

24     debriefed before and debriefed afterwards.  You need to stay

25     at the mic.  I'm not finished.  Why now do you think he is not

1   truthful?

2        MR. DeRENZO:  I don't believe he was fully truthful

3   at first.  I think there was an opportunity to further

4   cooperate after trial.

5        THE COURT:  But he doesn't have to cooperate.  He

6   just has to be truthful.

7        MR. DeRENZO:  Of course, Your Honor.  And so the

8   primary thing is I don't think he's been -- good reason to

9   believe, it's just not my belief, that he was not candid about

10  both the amounts of money that he was paid for the operation,

11  what his role was in the operations, specifically that he was

12  essentially the load guard hired by a Central American drug

13  trafficking organization to be on the boat.

14       The evidence we received in the recent debriefs,

15  which were in June and late July, if memory serves,

16  essentially conflict with all the other evidence we have on

17  that issue, including information from the captain of the

18  vessel and of course the vast experience that the

19  investigating agents have in these very similar type cases.

20       THE COURT:  Okay.  So subsequent to trial and in late

21  July -- this is August -- so very recently you received

22  information that he was the load guard?

23       MR. DeRENZO:  No, Your Honor.  In fact, we believed

24  that the entire time.  In fact, I think the testimony at trial

25  from the Special Agent Ray, who's a PANEX agent, was that

1    essentially the fact that he was from Belize -- of course

2    combined with his vast experience and knowledge of these kinds

3    of cases, was that his role was the load guard on that boat.

4         The way I hoped and what I anticipated is that when

5    we debriefed him after trial, that's what we were going to

6    hear.  We would hear more about that.  And it's my view that

7    that's -- what he told us was inconsistent with all the other

8    evidence we have on that issue.

9         THE COURT:  And inconsistent in that he denied being

10   the load guard?

11        MR. DeRENZO:  Yes, Your Honor.  Essentially his claim

12   was he didn't know that this was a drug trip until he had his

13   feet in Colombian soil in Cartagena.  Essentially what we

14   heard from the captain was he was introduced to him as the

15   load guard.  He knew the final destination of the drug trip.

16        He said that he was going to be paid approximately

17   50,000 Belizean dollars, which is roughly about 25,000 U.S.

18   dollars.  None of that he disclosed in his two interviews.

19        Frankly, what I told Special Agent Campbell when

20   Mr. Meighan had the opportunity to debrief was you need to

21   explain to him that he needs to give us all the information.

22   This is a rare opportunity.  Let's hear it all.  Let's put it

23   all out on the table.  So I was hopeful that would occur.  It

24   didn't occur.

25        THE COURT:  So that was subsequent to trial.

1          MR. DeRENZO:  Yes, Your Honor.

2          THE COURT:  All right.  So you are not recommending a

3    two-level decrease regarding the safety valve.

4          MR. DeRENZO:  That's correct, Your Honor.

5          THE COURT:  And normally it has to be the

6    Government's recommendation.  Okay.

7          Let me -- as long as you are here, let me ask you

8    about Mr. Reid-Dilbert.

9          MR. DeRENZO:  Mr. Reid-Dilbert did not debrief after

10   trial.  After having a chance to talk with Special Agent

11   Campbell about the substance of his debrief -- I wasn't

12   present for it.  So I just have the report of investigation

13   which sometimes doesn't give me the whole picture in terms of

14   what they knew, what their demeanor was like, did it seem like

15   they were giving us everything or holding back.

16          The gist of it is that he said he had -- he was

17   fighting them the entire way.  I was, like, well, do you think

18   he told you everything?  And essentially he's, like, no.  In

19   fact, when we would get to an issue like who's this person and

20   try to drill down on the information, even though he spent

21   considerable time with this individual, he would say, I don't

22   know, I don't know.  And all of that was consistent with his

23   combative demeanor during the interview itself.

24          THE COURT:  During the what?

25          MR. DeRENZO:  During the debrief interview.

1          THE COURT:  So he only debriefed prior to trial.

2          MR. DeRENZO:  That's correct.  He had a post-arrest

3   interview and then a follow-on debrief.  I mean, I think it's

4   relevant in terms when we're trying to evaluate their

5   credibility, notably all three Defendants in their post-arrest

6   interviews persisted in the lies that were exposed at trial.

7   It's not determinative of whether or not they were being

8   completely honest with the investigating agents, but it

9   certainly adds to the equation.

10          THE COURT:  Well, obviously they have the opportunity

11   to truthfully debrief right up until sentencing.

12          MR. DeRENZO:  That's right, Your Honor.

13          THE COURT:  So that's why I'm asking the question.

14          You have mentioned the captain a number of times.

15   The captain is still maintaining his not guilty plea.

16   Correct?

17          MR. DeRENZO:  To the best of my knowledge, Your

18   Honor.  In fact, I believe he's asking for a new lawyer.

19          THE COURT:  And he has debriefed, and you are relying

20   on what he is saying and he is claiming to be not guilty?

21          MR. DeRENZO:  That's correct, Your Honor.  During his

22   post-arrest interview, he admitted to be being the captain,

23   said he wanted to cooperate, he would give us everything, he

24   knew more than the other fellows, which is consistent with him

25   being the captain.  He did multiple debriefs when Mr. Nate

```
 1  represented him.  Of the -- of all the debriefs we have, it's
 2  my estimation that his was the most thorough and most
 3  detailed.  I fully expected that he was going to cooperate.
 4  It's probably in his best interest.  That said, that's the
 5  position he's taking.
 6           THE COURT:  Okay.  So that was -- he hasn't recently
 7  debriefed then.  That was early on.
 8           MR. DeRENZO:  That's correct, Your Honor.  Early on.
 9           THE COURT:  All right.  Interesting.
10           So I guess the bottom line is that you would object
11  to the safety valve as to both Mr. Meighan and
12  Mr. Reid-Dilbert.
13           MR. DeRENZO:  That's correct, Your Honor.
14           THE COURT:  Thank you.
15           MR. DeRENZO:  Thank you.
16           THE COURT:  All right, Mr. Dee.  We will start.
17  Mr. Meighan obviously is named first in the indictment.  So
18  we'll start with your client.
19           The objections you have raised are -- now, I suppose
20  also there would be one about the safety valve since that
21  switched, but you are objecting to the base offense level.
22  You are objecting to him not receiving a minor role.  You are
23  objecting to the obstruction of justice increase, and also to
24  him not receiving acceptance of responsibility.  So I will let
25  you proceed with whatever order you would like.
```

1          MR. DEE:  Judge, I will just follow that order if

2     that's all right with the Court.

3          The base level, Your Honor, it's our position that

4     what was proven at trial and what the jury found Mr. Meighan

5     guilty of was possession of -- or possession with intent to

6     distribute 5 kilograms or more of cocaine.

7          THE COURT:  Well, there's no doubt that's what the

8     jury found the Defendant guilty of.

9          MR. DEE:  Correct.  So now the question comes down to

10    the Government trying to attach an actual weight to that

11    cocaine other than 5 kilograms or more.  And the Government in

12    their own memorandum and in their documentation they filed

13    come up with about, I don't know, three or four different

14    weight quantities.  At trial, the testimony was 280 kilograms

15    of cocaine, which is the original guideline -- again, I know

16    Your Honor does not see the original pre-sentence reports.

17         THE COURT:  No.

18         MR. DEE:  But which was a level 36.

19         THE COURT:  I'm sorry.  I cannot remember that

20    testimony.  Whose testimony was that, the 280?

21         MR. DEE:  Judge, I believe it may have been actually

22    closing arguments.  And I don't have my notes with me from

23    trial here either.  I know that there was -- my

24    recollection -- let's put it that way -- there never was a

25    number of bales testified to.  The video was shown numerous

1    times.

2         THE COURT:  And I, in fact, went back and looked at

3    those exhibits yesterday.

4         MR. DEE:  And I don't recall anybody saying I stopped

5    it and counted it and there were X number of bales or white

6    objects floating in the ocean before they sunk.

7         So again, the original pre-sentence report also noted

8    that upon arrival, the Moncton, whatever, the Canadian vessel,

9    observed 14 bales of cocaine floating in the sea.  And then

10   that's where I think the number of 14 times 20 kilograms

11   became 280 kilograms, again also used in the original

12   pre-sentence report.

13        The Government now has decided they're going to rely

14   on the captain's debriefing and say that there were 30 to 34

15   bales, times 20, coming up with 600 to 740 or something

16   kilograms.  I find it strange that the one individual who is

17   still maintaining his innocence and is going to trial or at

18   least set to go to trial in September for stating that he is

19   not guilty of this is who the Government is relying on as

20   their witness for establishing weight and establishing

21   guilt -- or no safety valve on these Defendants.

22        THE COURT:  Well, they are also relying, I think, on

23   Mr. Newball May's testimony because I think he gave testimony

24   regarding the amount too.

25        MR. DEE:  Judge, in his debriefing or post-arrest

1  Miranda statement, he did give a number.  Mr. Meighan also

2  gave a number.  All these numbers are different.  Okay.  So my

3  position is that the only way the Court can come up with a

4  number of more than 5 kilograms is to speculate on who is

5  correct, because every number from the Government's own

6  sentencing memorandum lists, I think, three different weight

7  numbers in it, one from Mr. Newball May, one from the captain,

8  one from Mr. Meighan, one from Mr. Ray's estimate.  I'm asking

9  the Court to determine that all we have evidence of is that

10 the jury found him guilty of more than 5 kilograms.  So we are

11 asking to use a base level of 30 based upon the evidence that

12 the jury relied upon and found him guilty of.

13         To otherwise count bales, I mean, I guess, again, if

14 the Court is of the belief that every one of those bales did

15 contain 20 kilograms of cocaine, which I'm not sure there was

16 any evidence at trial on that other than --

17         THE COURT:  I think we had a witness, maybe two

18 witnesses that did testify that it appeared to them to be 20

19 kilos, bales of 20 kilos.  They were looking at the video just

20 like we were looking at the video.

21         MR. DEE:  Exactly.  They are looking at a video shot

22 from an airplane that's several hundred, if not a thousand

23 feet away.  So I just think that when we look at the Court

24 trying to make a relevant conduct ruling here as to what is

25 the weight, the weight is more than 5 kilograms, and that is a

1  level 30 base, not 280 kilograms which is level 36, not 740

2  because that's what the captain said there was or not 600

3  because that's what Mr. Newball May said there was.  So that's

4  what we are asking for is to start with a base level of 30.

5        THE COURT:  You would agree that the Government's

6  proof is by preponderance of the evidence here as far as the

7  amount is concerned.

8        MR. DEE:  Right.

9        THE COURT:  And, I mean, watching the videos, it did

10  look like more, a whole lot more than five kilos that were

11  being sunk.

12        And I will have to ask the Government this question.

13  As far as the amount is concerned, as I recall it, the

14  estimations are the result of looking at the numbers on the

15  video, and we had a couple of witnesses estimate that they

16  thought those looked like 20 kilos or 20-kilo bales or

17  bundles, and then the debriefing testimony of the Defendants.

18  That's where the amounts come from, as far as I know.

19        So you would say then it would be a base offense

20  level of 30.

21        MR. DEE:  Yes, Your Honor, based upon it being at

22  least 5 kilograms or more.

23        THE COURT:  Okay.  Go ahead with your other

24  objections.

25        MR. DEE:  All right.  I think my next objection going

1   down the list here, Your Honor, would be to the -- well,

2   again, we support the safety valve position obviously.  The

3   Government has met with Mr. Meighan.  He has, we believe,

4   completely truthfully debriefed.  Again, their position of not

5   believing it's 100 percent truthful is that they are relying

6   on the captain's statement from several months ago, again the

7   captain who is still as we sit here today innocent because he

8   has not gone to trial yet, and he is maintaining his innocence

9   as far as we know.

10       So we would ask that the safety valve does apply and

11  that he has met all five requirements to be in the safety

12  valve.

13       THE COURT:  Well, isn't a plea of not guilty, I'm not

14  guilty of this offense, isn't that contrary to -- I mean,

15  unless that debriefing, it was a debriefing after he went to

16  trial that you are relying on, anything that happened prior, I

17  would think, really doesn't matter because he said I'm not

18  guilty of any of this and went to trial.  So if it's something

19  that happened after and before sentencing, then I would agree

20  I could consider that.

21       MR. DEE:  And, Judge, I think that the safety valve

22  requires that somebody be -- you know, the main point we are

23  on here is that they truthfully advised what took place.  My

24  position would be that Mr. Meighan truthfully advised the

25  facts here both before and after the trial.

1      So if the Court is concerned about or saying that you

2   think because of the not guilty plea his debriefing pretrial

3   would not qualify, he debriefed twice after trial.  And I

4   think that at that point he maintained the description of what

5   took place.  He admitted involvement in this.

6      The dispute, as Mr. DeRenzo just stated, is the

7   amount he got paid.  And his statement was his pay was going

8   to be to get a boat and be set up for a dive camp when he got

9   back to Belize.  The captain said he was going to get 50,000

10  Belizean dollars.  I don't know what the value of the dive

11  camp is.  I think there was some estimate in one of his

12  debriefings.  It was not 50,000.  But again, the Government is

13  relying on the captain here who is the one person who as we

14  sit here today is still not guilty and maintaining that he's

15  not guilty.

16     As far as being a load guard, I'm not sure

17  Mr. Meighan knows what that term means, but he did acknowledge

18  that he was on that boat to get them into Belize, to get them

19  over the reef because the lighthouse doesn't work there, etc.

20     So I think that, again, I understand the Government

21  has their position.  If they choose not to believe

22  Mr. Meighan, that's their choice.  They have the right to do

23  so.  But as far as qualifying for a safety valve, I believe he

24  has met that requirement and, again, because of the debriefing

25  post trial.

1          THE COURT:  Give me just a minute here.  I wanted to

2     ask you a question about that.  The statute itself, which is

3     18 United States Code Section 3553(F) says the following:  And

4     I'm just paraphrasing, but it says if the Court finds at

5     sentencing after the Government has been afforded the

6     opportunity to make a recommendation that -- and I'm not going

7     through what doesn't apply here -- not later than -- I'm now

8     reading from F5 -- not later than the time of the sentencing

9     hearing, the Defendant has truthfully provided to the

10    Government all information in evidence the Defendant has

11    concerning the offense or offenses that were part of the same

12    course of conduct or a common scheme or plan, but the fact

13    that the Defendant has no relevant or useful information does

14    not preclude.

15         But I guess what I'm relying on is that it says that

16    the Government has been afforded the opportunity to make a

17    recommendation that not later at the time of sentencing

18    Defendant has truthfully provided the Government with all

19    information.

20         Mr. DeRenzo says he has not truthfully provided the

21    Government with information.  I don't know that I have ever

22    granted a safety valve when the Government has stood up and

23    told me that he is not truthfully provided the Government with

24    all the information.

25         MR. DEE:  And, Judge, I understand that.  I would

1  only distinguish that this is -- I believe safety valve is a

2  determination solely for the Court.  It's not like a 5K or

3  whatever that requires the Government to file a motion for it.

4  It is the Defendant is submitting to the Court he has met all

5  five categories under 18 United States Code 3553(f) and has,

6  again, debriefed numerous times, including twice since trial.

7          I understand the situation.  Mr. DeRenzo says he's

8  not telling the truth.  The Court is at a little bit of an

9  awkward situation granting a safety valve, but I think that

10  Mr. DeRenzo very candidly told the Court the two things he

11  questioned, which were the amount of money he got paid and

12  whether or not he was the load guard.  And again, I think the

13  word "load guard" has caught us up maybe in some of these

14  debriefings, but the point is in the last debriefing he

15  acknowledges he was on that boat to get the boat into Belizean

16  waters, across the reef safely.  Now, he does not admit he was

17  a load guard.  I think we are talking semantics here now.

18          If he is on the boat to get the boat into Belizean

19  waters safely, that's kind of acknowledging why he was on that

20  boat.  So the question comes down to the captain says he got

21  paid 50,000 Belizean dollars.  He says he didn't.  He was

22  going to be set up for a dive camp.

23          Your Honor, at trial I know I presented the picture

24  of what he had on him at the time.  I don't recall exactly,

25  but I think it was 10 or 12 American dollars on him, not

1    50,000, whatever.

2           And additionally, I think the Court could acknowledge

3    if we are talking about, as the Government mentioned, the

4    standard proceedings here, even if he were to be paid money, a

5    lot of that money is usually back-end loaded, meaning upon the

6    successful venture.  They are not given all the money up

7    front.

8           So for Mr. Meighan to say he was not -- he had not

9    received $50,000, I think that's just as believable or maybe

10   more believable than the captain saying he got it because the

11   captain would have no knowledge of that.

12          THE COURT:  Go ahead.

13          MR. DEE:  Your Honor, we ask for a two-level

14   adjustment for the role in the offense, a two-level reduction.

15   I am aware and I have spoken to Mr. Meighan about not just

16   this Court but the Middle District's position on that as to

17   most individuals on a boat are considered one in the same,

18   they are all part of the conspiracy.

19          But we still believe that when you take his role in

20   comparison to the entire conspiracy, which would be the

21   cartels in Colombia, the people receiving in Belize or

22   Ecuador, wherever this boat was headed to, the captain on the

23   boat, his role is substantially less than those people.  So

24   that's why we're asking for the two-level reduction.

25          THE COURT:  Okay.  I think you had some more.

1          MR. DEE:  And, Your Honor, acceptance of

2     responsibility is the next two levels we would ask for a

3     reduction.  I would cite to the Court the fact that the

4     guidelines state that in a note, an application note, that

5     just going to trial alone does not preclude a Defendant from

6     getting two levels for acceptance of responsibility.

7          Mr. Meighan, as you heard from the Government,

8     debriefed pretrial, debriefed twice after trial.  He did not

9     testify at trial.  He did not give any statements contrary to

10    whatever he said in his debriefings.  He merely exercised his

11    constitutional right to go to trial and have the Government

12    prove his guilt beyond a reasonable doubt, which the jury

13    found.

14         So we would ask that he be considered for the

15    two-level reduction for acceptance of responsibility, again

16    based on the guidelines application note that says going to

17    trial alone does not preclude them from receiving that.

18         And, Your Honor, I think that would be it.  If the

19    Court were to grant all of those, I think it would start at a

20    level 30, and I think he would end up at a level 24.

21         THE COURT:  You also had an objection regarding the

22    obstruction of justice.

23         MR. DEE:  Judge, I don't believe that they should --

24    the two-level obstruction should be applied to them.  Even if

25    the Court in looking at that video says that they destroyed

1   evidence, that was prior to any arrests or any interdiction by

2   the Coast Guard.  They had a plane flying over them is the

3   only thing that happened.  There was no approach by anyone

4   telling them that they were being detained or arrested,

5   that -- you know, they made a decision upon seeing an airplane

6   to eliminate their cargo.  So that's how I would disagree with

7   the obstruction role.

8        THE COURT:  Well, you know, I think there is a

9   distinction here.  I mean, at first glance you think, okay,

10  this is similar to somebody that swallows drugs or flushes

11  drugs down the toilet just as soon as they see the police

12  officer outside their residence or something like that.

13       But here -- I mean, that's more of a spontaneous

14  thing.  Here, I mean, this took hours to tie those bales to

15  the rope and to sink them with the motor.  This was a well --

16  this was a planned, time-consuming thing.  It wasn't a

17  spontaneous thing that I would think maybe would take it out

18  of the category of somebody that swallows drugs or flushes

19  drugs down the toilet.

20       They knew the plane was flying overhead, and they

21  started preparing to ditch the drugs and obviously with the

22  understanding it's going to be hard to convict them of

23  possession of drugs when there's no drugs.  It just seems to

24  me that this may be a situation where this does apply.  But

25  anyway, okay.

1     I think I have one other question to ask you.  Maybe

2  that's more appropriate for the Government.  So let me -- you

3  can go ahead.

4     MR. DEE:  That would conclude, then, all of my

5  objections, Your Honor.  Thank you.

6     THE COURT:  All right.  Mr. Brunvand.

7     MR. BRUNVAND:  Good morning, Your Honor.

8     Initially when the pre-sentence report came out,

9  obstruction was not one of the enhancements that were

10  included.

11     THE COURT:  No.

12     MR. BRUNVAND:  The Government did object.  And then

13  it was amended and added as a two-level increase.  So I did

14  not file any objections initially based on that.

15     When I saw the -- obviously, I initially agreed with

16  not using the obstruction.  And so when the objections were

17  filed in the sentencing memo, the co-Defendant, in reviewing

18  those, I believe it was appropriate for me to adopt the

19  arguments as to both the minor role as well as the objection

20  against the obstruction enhancement.

21     I don't believe that my client is eligible for any of

22  the other considerations in light of the fact that he does

23  maintain his innocence.  He does not -- I did meet with him

24  about the briefing.  We were trying to debrief again after the

25  trial and just discuss the potential benefits of that.  And he

```
1   has continued to maintain his innocence.  And so, therefore,
2   other than adopting those arguments, there's really nothing
3   else that I can present to the Court at this point other than
4   when we get to the point of arguing what an appropriate
5   sentence should be.
6           THE COURT:  What is your position on Mr. Dee's
7   objection regarding the amount of drugs?  Are you adopting
8   that or not?
9           MR. BRUNVAND:  I will adopt that.  I don't want to
10  argue.  I will adopt it, yes.
11          THE COURT:  All right.  Thank you.
12          MR. BRUNVAND:  Thank you, Your Honor.
13          THE COURT:  All right.  Mr. Amador on behalf of
14  Mr. Dilbert.
15          MR. AMADOR:  Good morning, Judge.  May I begin?
16          THE COURT:  Sure.
17          MR. AMADOR:  For purposes of the record, I'm
18  objecting to Paragraph 8, which is the weight.
19          THE COURT:  Now, you're referring to the final
20  pre-sentence report.  Correct?
21          MR. AMADOR:  I beg your pardon?
22          THE COURT:  When you are giving me the paragraph --
23          MR. AMADOR:  Yes.  I'm sorry.  Let me look at the
24  document number.  Document 147.  I think that's the final PSR,
25  Paragraph 8.  It's just where it says what the amount was.
```

1          THE COURT:   I think the amount would be Paragraph 10

2     in the final -- no.   That's post-arrest interview.

3     Paragraph 8 says once the go-fast vessel was detected, the MPA

4     observed and recorded crew members throwing over 30 bales of

5     cocaine in the water, which were attached to the GFV by two

6     separate lines.

7          MR. AMADOR:   Let me -- if I may, Judge, I'm sorry to

8     interrupt, but let me just make the objections to 8, 9, 10,

9     and 11.   It all deals with the weight.   We object to 8 and

10    9 because -- we object to -- we don't object to the fact that

11    perhaps Mr. Hinestroza said those things, but we object to the

12    veracity thereof.   And obviously 11 is the final weight of the

13    drugs as determined by probation, and 8 was because of the

14    amount of bales.

15         THE COURT:   All right.   Go ahead.

16         MR. AMADOR:   I would adopt the arguments that Mr. Dee

17    said with respect to the weight for the purpose of making this

18    a little quicker.

19         I would like to point out that the 280 kilograms came

20    from, I think it was Document 1, but it came from the criminal

21    complaint in the case in which there was the sworn statement.

22    The affidavit said that there were 14 bales, and they

23    estimated it to be 280 kilograms.   So I believe that that's

24    where that number comes from.   And that's at page 5 of the

25    criminal complaint.   And I don't have -- that complaint that I

1    have doesn't have a number on it, but I'm assuming it's

2    Number 1 on the docket.

3            And I don't know that I have really much more to add

4    to the argument of the weight.  Clearly our position is that

5    it should be the 5 kilograms.  If in the alternative the 280,

6    in light of the criminal complaint, either way I think it

7    changes the base offense level for this particular case.

8            We also make objections to paragraph 18, 21, 23, 26.

9    Those are all related to minor role.  And 18 is the objection

10   for --

11           THE COURT:  The base offense level.

12           MR. AMADOR:  -- the base offense level.  Obviously

13   all of those deal with the fact that once you have granted a

14   minor role, those numbers change.  But I just wanted to put

15   that on for the record in the event that there is any question

16   that I'm not objecting to the other and how those were

17   calculated.

18           THE COURT:  Okay.  And you too are objecting -- just

19   so I'm clear on this, you too are objecting to the -- well,

20   are you to the obstruction of justice?

21           MR. AMADOR:  Absolutely.  And I put in my memorandum

22   that I, in fact, was objecting to it, and I gave some argument

23   about that.

24           What you just said about, you know, someone almost

25   being arrested and throwing away the drugs, I don't think that

1  this situation is any different than that.  The only

2  difference is perhaps scale.  And that's -- you know, my

3  argument, I have a number of arguments why this should not

4  apply.  The first one would be that.

5         You know, if you find that it's similar to that,

6  okay, yeah, it took them two hours according to the

7  Government's witnesses, but this isn't -- we are not talking

8  about, you know, a rock of crack cocaine.  So I think we have

9  to take that into consideration.

10         So I do believe that if you look at it as being

11  contemporaneous with arrest, which would mean that the minute

12  they saw the plane, they're -- it's somehow contemporaneous

13  with arrest, then them throwing it away has to hinder the

14  prosecution.  I would argue that it didn't hinder the

15  prosecution, as I argued in my memo, because they in fact got

16  evidence not only from the plane of what happened but they

17  were able to present it to a grand jury who indicted them and

18  presented it to a jury which ultimately convicted, although we

19  respectfully disagree with that, but I don't see that that's

20  an appropriate use of the obstruction of justice.

21         Second, I would argue that it's not obstruction of

22  justice because when that is occurring, when you see that on

23  that video and that's occurring, the Government of the United

24  States does not have jurisdiction over that boat.  They don't

25  have -- they can't do anything to that boat really until they

1   have jurisdiction.  And they don't have jurisdiction until

2   they have gone there, asked right-of-approach questions and

3   gotten information from either the government of Colombia or

4   have determined that it's a vessel without nationality and

5   have gotten approval from, I guess it's District 11, or

6   whichever district it is of the Coast Guard that gives -- that

7   asks the State Department to confer jurisdiction on the United

8   States.

9         So my argument is that if they are not under the

10  jurisdiction of the United States, then they can't be held

11  responsible for obstruction of justice.

12        Finally, my argument is, my third argument for that,

13  I guess -- I have another one, but the Government in U.S. v.

14  Massey cited at 443 F.3d 814, it's a case in which -- well, in

15  this case the Court cites another case.  And that case is --

16  and this is at page 821.  They cite a case by the name of

17  United States v. Savard, 964 F.2d 1075.  And it's a case in

18  which people are stopped on a sailboat.  The Coast Guard asks

19  them for information.  They failed to tell them that they had

20  been previously stopped by the Coast Guard and they had gotten

21  a slip of paper.

22        And the Court said there that that was not

23  obstruction of justice, the fact that they didn't reveal they

24  had been previously stopped because, and I quote, "Because at

25  the time of the Defendant's arrest, the agents already knew

1  all the information contained on the slip of paper, e.g., that

2  the boat had been boarded in the Yucatan."

3          Here is my argument with regard to that.  We had

4  evidence here that they had intel and that's why they were in

5  the particular area where -- the plane was in the particular

6  area where they were.  Well, of course they had intel.  The

7  sea is huge.  The Caribbean is ginormous.  There's no way.

8  It's like finding a needle in a haystack.

9          So my argument is that the Government already knew

10  that they were looking for a boat ladened with drugs.  And

11  that's why they were there at the particular place at the

12  particular time to find that particular boat that they had

13  information was transporting drugs.

14          So similar to the issue in Savard, the Government

15  already knew there were drugs on the boat.  So there is

16  nothing that the Government didn't already know when they

17  discarded the drugs that the Government didn't already know.

18  So again, my position is that this isn't obstruction of

19  justice.

20          My final -- I'm sorry.  I said final before, but my

21  fourth argument would be one of, I guess disparity for lack of

22  a better term.  I've represented many people in these types of

23  cases.  And almost in every single go-fast case there are --

24  there's throwing overboard of bales.  And in none of those

25  cases that I have ever represented both after trial and plea

and even plea, cooperating, I have never had the Government

request this enhancement.  And I find it interesting that for

my next argument about minor role the Government cites United

States of America v. Emiliano Palma-Meza.  It's

Number 16-12690, decided -- it's a nonpublished opinion, but

it's decided on April 17, 2017.  And in that case, there was

a -- the Court says, well, they -- there was a question about

the quantity of drugs.  And they said that they had recovered

480, but there were some that they had thrown over and they

hadn't been able to recover and so who knows how much?  We

don't know how much sank.  And the Court went on to say that's

not insignificant.

        My point here is, and while this is a case dealing

with minor role, in that case the Government didn't ask for an

obstruction of justice enhancement because of them throwing

the drugs overboard.  So this part of my argument is -- I

guess it's a disparity argument and I guess perhaps overkill.

        THE COURT:  Well, you know, I can see a distinction

from having had a bunch of these cases, many, many cases, the

Defendants throw the bales overboard.  And in most instances,

they are able to recover the bales.  And so I can see, okay,

maybe that wouldn't be obstruction of justice, although maybe

it's an attempt to obstruct justice, but it still hasn't made

any difference.

        Here we have got a real question as far as the amount

of drugs that they should be held accountable for because we

have no drugs.  We have none at all.  And I think you all have

argued that they shouldn't be held accountable for any more

than the 5 kilos or more that the jury found them guilty of,

or the 5 kilos which was the minimum amount.

        So it's a little different from some of the cases.  I

would agree there are other cases where they have destroyed

the drugs, they sunk the drugs and the Government hasn't

requested an obstruction of justice.  That's true.

        MR. AMADOR:  Well, Judge, in response to that, I

would argue to the Court that the intel that they received was

obviously some individual that's on land that's cooperating

with the Government that has information about this particular

boat, and they could have burned that particular source and

brought them in to tell exactly how much cocaine was on that

boat.  So they could have done that, and they chose not to do

that.  And, you know, that's not for me to say why not, but I

think I know why.  I think we all know.

        THE COURT:  Okay.

        MR. AMADOR:  That's my argument with regard to that.

        THE COURT:  All right.

        MR. AMADOR:  And my -- let's just go down the road, I

guess.  Paragraph 19 would be the safety valve.  I just would

like to point out to the Court that the Court had made a

comment about the time.

1        THE COURT:  You mean the time he debriefed?

2        MR. AMADOR:  Correct.  And I just wanted to point out

3   to the Court, I think it's -- at least I should point out to

4   the Court that in U.S. v. Garcia, 405 F.3d 1260, in that case

5   the Court said that it dealt with the temporal issue of when

6   one debriefs, and it said -- this is a case in which the

7   person went to trial.  They didn't debrief.  They asked for a

8   continuance to debrief.  And the Court didn't -- the district

9   court did not grant that continuance, and it got remanded for

10  that purpose.

11       I'm just informing the Court that this case exists,

12  and I think that the Court was alluding to the fact that if

13  you debrief before trial, it's different than debriefing after

14  trial, and I would suggest that I think that this might say

15  something different.

16       THE COURT:  No, I don't think it does.  I think --

17  because I've had that -- in fact, I let someone continue the

18  case so somebody could debrief on a boat case after they went

19  to trial.  And it just says that, you know, no longer than

20  prior to the date of sentencing, which was somewhat surprising

21  to me because it does seem inconsistent with going to trial

22  and then, you know, truthfully debriefing.

23       But I think there is a difference between -- and

24  really it all depends on whether it's truthful or not, but

25  debriefing prior to trial and then saying, oh, no, I'm not

1    guilty and going to trial.  I mean, I see a big difference.

2            MR. AMADOR:  Well, that being said, Judge, I just

3    wanted to point that out to you because of the arguments.

4    That being said, at the direction of my client I stand silent

5    on that issue.

6            So now we are at the minor role issue.  And, Judge, I

7    filed my memorandum.  And obviously that's a big part of my

8    argument, but I would like to point out to the Court that in

9    this case the Government presented evidence that it wasn't

10   just these four individuals on this boat that participated in

11   this transaction.

12           Agent Ray came in and said that there are a number of

13   other people that are involved.  And, in fact, he gave a great

14   explanation of the various routes that they take.  And, you

15   know, those routes I think require people that refuel and plan

16   the routes, and there's a buyer and then there's a seller.  So

17   there are other people than these four people on this

18   particular boat involved in this particular conspiracy.  And,

19   in fact, the indictment says that there are unknown people.

20           That doesn't mean that they are discernible.  I think

21   they are discernible in that there's a buyer, there's a

22   seller, there's people that are organizing it.  There are

23   people who are refueling a vessel that's in the middle of the

24   ocean traveling thousands of miles presumably.

25           So my argument is that these four people on the boat

1    are a minor participant as compared to the buyer, the seller,

2    and the other people that are organizing this venture.

3            The Government, in one of the cases it cites, it's

4    the Palma-Meza case that it cites.  And also in the U.S. v. --

5    the other case that it cites.  I'm sorry.

6            THE COURT:  I don't know.  I can't remember what they

7    cite.  They usually cite De Varon, but I can't remember --

8            MR. AMADOR:  Right.

9            THE COURT:  -- off the top of my head which one.

10           MR. AMADOR:  Anyways, in that other case, the Court

11   in both of those cases were dealing with -- were saying that

12   the person wasn't distinguishable from their co-Defendants.

13   They did not look at the true conspiracy in this case.  And I

14   am not, for the record to be clear, I am not talking about the

15   guy that grows the cocoa leaves and the guy that runs the lab.

16   I'm talking about the people involved in the quantity of

17   cocaine that was on this boat that was traveling in

18   international waters to wherever its destination, according to

19   Agent Ray, to Belize.  I'm talking about those people.  I'm

20   not talking about anybody else other than involved in this

21   organization.

22           I think that those other cases are distinguishable

23   because the Court just said that those were those people and

24   their role was indistinguishable one from the other.  And my

25   argument is that here there is a bigger number of people that

1    are involved.  The Government by its own expert established

2    that.  And there was no evidence that my client had any

3    propriety interest in this drug.  There was no evidence that

4    my client had any role in planning this trip.  There was no

5    evidence that my client had any authority at all.  And I think

6    that those factors are factors that the Court should look at

7    in determining whether you should grant a role reduction for

8    this case.

9         And it's my position that because there are more

10   people than the four people on this boat involved, that in

11   fact they're mules.  They are but players in this conspiracy,

12   and they should, in fact, receive a role reduction because

13   they are minor participants.

14        I think that that's -- those are my objections.

15        THE COURT:  Okay.  Mr. DeRenzo?

16        MR. DeRENZO:  Your Honor, before I get to my legal

17   response to the various objections, given that Mr. Amador has

18   objected on behalf his client to the factual content, I think

19   that the Court needs to make the determination as to the drug

20   weight.

21        I do have Special Agent Campbell present, and he's

22   prepared to testify so the Court can make the credibility

23   determination necessary to give the appropriate weight, if

24   any, to Mr. Hinestroza's pretrial statements with respect to

25   the number of bales and the drug quantity.

1        THE COURT:  Now, are you talking about the safety

2   valve or are you talking about just drug quantity that they're

3   all responsible for?

4        MR. DeRENZO:  I can elicit testimony with respect to

5   the safety valve, Your Honor.  I don't think it's necessary

6   since it's not our burden to essentially show that somebody

7   was being untruthful, but so the record is clear.

8        THE COURT:  I guess what I'm asking is what's the

9   purpose -- it's fine.  I just don't know what the purpose of

10  the testimony is.

11       MR. DeRENZO:  So right now what we have are

12  statements in the PSR that come from a port investigation with

13  respect to the statements made by both Defendant Newball May

14  and Defendant Hinestroza-Newbbooll.

15       THE COURT:  Regarding amount?

16       MR. DeRENZO:  Yes, Your Honor.

17       THE COURT:  Okay.  That's fine.

18       MR. DeRENZO:  And given the argument by Mr. Dee

19  about, well, that's just a statement, it's hard for the Court

20  to make the veracity, and the authority I've cited in my

21  brief, which is essentially the Court can certainly rely on

22  hearsay so long as it makes an appropriate finding with

23  respect to its reliability.

24       Now, that's not, I don't think, an insurmountable

25  obstacle when you take all the evidence together and you can

DIRECT EXAMINATION OF TIMOTHY CAMPBELL

1  decide whether it's internally consistent.  But what Special

2  Agent Campbell can give us, since he was present at the

3  interview, is essentially credibility type information, the

4  scope of the interview, did he appear to be candid, what was

5  his misdemeanor and things of that nature, but at this time I

6  request permission to call Special Agent Campbell.

7        THE COURT:  All right.  Sir, if you will come forward

8  to be sworn.

9     (Witness sworn.)

10        THE COURTROOM DEPUTY:  Please have a seat in the

11  witness box.  Would you state your name and spell your last

12  name for the record.

13        THE WITNESS:  Timothy Campbell, C-A-M-P-B-E-L-L.

14        THE COURT:  Mr. DeRenzo?

15        MR. DeRENZO:  Thank you, Your Honor.

16     **TIMOTHY CAMPBELL, CALLED BY THE GOVERNMENT, SWORN**

17                    **DIRECT EXAMINATION**

18  BY MR. DeRENZO:

19  Q    Good morning, Special Agent Campbell.

20  A    Good morning, sir.

21  Q    What agency are you with?

22  A    Homeland Security Investigations.

23  Q    Where are you currently assigned?

24  A    Panama Express North in Tampa.

25  Q    What is that briefly?

DIRECT EXAMINATION OF TIMOTHY CAMPBELL

1  A    It's a multiagency strike force that investigates

2  maritime smuggling in the Caribbean.

3  Q    How long have you been with that strike force?

4  A    A total between both strike forces, South and North, a

5  little over 11 years now.

6  Q    And if you had to estimate, approximately how many

7  investigations have you been involved in?

8  A    Upwards of 40 or 50, at least.

9  Q    And of those 40 or 50, how many -- what percentage would

10  you estimate involved cocaine, maritime cocaine smuggling?

11  A    All but one.

12  Q    In the course of your duties as a PANEX agent, have you

13  had the opportunity to help process bulk amounts of cocaine?

14  A    Yes, sir.

15  Q    And if you had to hazard a guess, how many bales do you

16  think you have helped process as a PANEX agent?

17  A    Bales total?  I would assume in the hundreds of

18  thousands.

19  Q    Okay.  So fair to say you are familiar with how it's

20  typically packaged?

21  A    Yes, sir.

22  Q    Are you familiar with how much a typical bale weighs?

23  A    Yes, sir.

24  Q    And among those thousands of bales that you have

25  personally processed, how many of them have been less than 20

DIRECT EXAMINATION OF TIMOTHY CAMPBELL

1  kilograms of cocaine?

2  A    I have never had one less than 20.

3  Q    I take it as part of your duties at PANEX is to conduct

4  interviews of suspects?

5  A    Yes, sir, it is.

6  Q    How many interviews have you personally been involved in?

7  A    Hundreds.

8  Q    And how much -- do you have a figure used to proximate

9  the wholesale value of a single kilogram of cocaine?

10         THE COURT:  Why is that relevant?

11         MR. DeRENZO:  Your Honor, I believe this is relevant

12  for the minor role issue raised by the Defendants.

13         THE COURT:  Okay.

14  A    We use 30,000 a kilogram is the standard that we use.

15  BY MR. DeRENZO:

16  Q    Thank you.

17  A    Wholesale cost.

18  Q    Now, are you involved in -- were you involved in the

19  investigation regarding the three Defendants here today?

20  A    Yes, sir.  I was the lead case agent on this case.

21  Q    In the course of your duties as the lead case agent, did

22  you have an opportunity to interview an individual named Emiro

23  Hinestroza-Newbbooll?

24  A    I did, sir.  Yes.

25  Q    How many times did you interview him?

DIRECT EXAMINATION OF TIMOTHY CAMPBELL

1  A     Two debriefs.

2  Q     And is it fair to say he was initially very cooperative,

3  wanted to debrief with you?

4  A     Yes, sir.

5  Q     Did he at any point admit to what his role in the offense

6  was?

7  A     Yes, sir.  He said he was the captain.

8  Q     During -- what was the nature of this interview?  Were

9  these interviews -- excuse me -- was this the post-arrest

10 statement or a debrief?

11 A     No, sir.  These were debriefs after arrest, several days

12 after the arrest.

13 Q     So at this point he was -- to the best of your knowledge,

14 he was in a cooperating posture?

15 A     Yes, sir.

16 Q     Okay.  How long were these interviews?

17 A     The first one was probably an hour and a half plus, maybe

18 close to two hours.  The second one was probably closer to an

19 hour, if I had to guess.

20 Q     Okay.  And what was his demeanor during the interviews?

21 A     I thought he was very forthcoming.  He was very detailed

22 in his debrief.

23 Q     Did he seem combative at all?

24 A     No, sir.

25 Q     When you asked him follow-up questions, was he able to

DIRECT EXAMINATION OF TIMOTHY CAMPBELL

1  provide you more detail?

2  A    Yes, sir.

3  Q    Did he seem to hesitate in response to your questions?

4  A    Not that I recall, no, sir.

5  Q    How would you describe the level of detail of his

6  interviews as opposed to the other Defendants that you

7  interviewed?

8  A    It was quite substantially more detailed than the rest.

9  Q    Were you able to corroborate the information that he gave

10  you, some of it?

11  A    Some of it through the other interviews, yes, sir.

12          THE COURT:  The other interviews of the Defendants?

13          THE WITNESS:  Yes, ma'am.

14  BY MR. DeRENZO:

15  Q    Now, at any point did Mr. Hinestroza-Newbbooll tell you

16  in his interviews how many bales of cocaine were on the

17  vessel?

18  A    Can I refer to my —— I know it was 780 kilograms, which

19  comes out to 19 bales, divided by 20.

20  Q    Do you recall as you sit here today how many bales he

21  told you?

22  A    Can I refresh my memory with my report?

23  Q    You may.

24  A    I'm sorry.  I have to pull out my glasses.

25  Q    When you're done refreshing your recollection, just look

DIRECT EXAMINATION OF TIMOTHY CAMPBELL

1    up.

2           THE INTERPRETER:  May the interpreter get a cup of

3    water, please?

4           THE COURT:  Sure.

5    A    Ready whenever you are, sir.

6    BY MR. DeRENZO:

7    Q    Do you recall now how many bales of cocaine

8    Mr. Hinestroza-Newbbooll admitted were on the vessel?

9    A    Thirty-eight bales.

10   Q    And approximately how many kilograms?

11   A    780 -- 760 kilograms.

12   Q    And in your experience investigating hundreds of cases

13   you've been involved in, would a captain of a go-fast vessel

14   be in a position to know how much drugs are on his boat?

15   A    Yes, sir.

16   Q    He is in -- fair to say he's in charge of the operation

17   of that vessel?

18   A    Yes, sir.

19   Q    Did Mr. Hinestroza discuss with you the roles of any of

20   the other Defendants?

21   A    Yes, he did.

22   Q    What did he say about the role of Mr. Meighan?

23   A    He said when he was introduced to him, he was introduced

24   to him as the load guard.

25   Q    And did Mr. Hinestroza-Newbbooll tell you anything about

DIRECT EXAMINATION OF TIMOTHY CAMPBELL

1  whether Mr. Meighan knew the final offload destination?

2  A    He believed that only Mr. Meighan knew the final offload

3  designation.

4  Q    And according to Mr. Hinestroza, what was that location?

5  A    Somewhere in Belizean waters.

6  Q    When you debriefed Mr. Hinestroza, did he describe how

7  Mr. Meighan came to meet him?  In other words, did he travel

8  with the other Colombians involved?

9  A    No, sir, he did not.

10 Q    According to Mr. Hinestroza, did Mr. Meighan mention

11 anything to him about how much he was going to be paid for

12 this operation?

13 A    May I refresh my memory?  I want to get the number

14 correct.

15 Q    You may.  Just please look up when you're done.

16 A    During conversation between the two, Mr. Hinestroza told

17 us that Mr. Meighan was going to be paid 50,000 Belizean

18 dollars.

19 Q    How much is that in U.S. currency?

20 A    I believe it's 24,000 U.S. dollars.

21 Q    Did Mr. Hinestroza discuss how much the other crew

22 members were going to be paid -- or were paid?  Excuse me.

23 A    He did, yes, sir.

24 Q    How much was Mr. Reid-Dilbert and Mr. Newball May paid?

25 A    Approximately 11,000 for Jorge Newball May in American

DIRECT EXAMINATION OF TIMOTHY CAMPBELL

1  U.S. dollars and approximately 10,000 for Calbot Reid-Dilbert

2  in U.S. dollars.

3  Q    And according to Mr. Hinestroza, how much -- were they

4  promised to be paid any additional moneys were this operation

5  to be successful?

6  A    Yes, sir.  Double that.

7  Q    Now, in the hundreds of cases you've been involved in,

8  have you ever encountered previously a situation like we have

9  in this case where there's somebody from Central America on a

10  boat with people from Colombia?

11  A    Yes, sir.

12  Q    And what is the significance of that fact?

13  A    In all the other cases, that person is the load guard.

14  He's responsible for the cocaine where it's destined to.

15  Q    Can you recall from any other investigation where you had

16  that factual scenario where there was a Central American on a

17  boat with three South Americans and he was not the load guard?

18  A    No, sir.

19  Q    Now, at some point did either you or your co-case agents

20  do an interview of Defendant Newball May?

21  A    Of who?

22  Q    Newball May.

23  A    He gave post-arrest statements but no debrief.  Yes, sir.

24  Q    Are you familiar with the statements he provided to

25  federal agents?

DIRECT EXAMINATION OF TIMOTHY CAMPBELL

1   A     I have the report here in front of me, yes, sir.

2   Q     What did Mr. Newball May say about the sacks onboard the

3   vessel?

4   A     What they were?

5   Q     What did he tell federal agents about those sacks?

6   A     That they were conch.

7   Q     Did he mention what he and his co-Defendants did with the

8   sacks onboard?

9   A     They were tied to the engine and thrown overboard.

10  Q     Did he mention how they were tied together?

11  A     I would have to -- that specific detail I need to read.

12  Q     Well, if you don't remember now, you can certainly refer

13  to your report and then look up when you're done.

14        Did he provide an estimate to federal agents, he

15  being Newball May, about how many sacks that they tied

16  together?

17  A     Fifteen to 17 per rope.

18  Q     How many ropes?

19  A     Two ropes, one to each engine.

20  Q     And what prompted, according to Mr. Newball May, for them

21  to throw the sacks overboard?

22  A     Seeing the plane overhead.

23  Q     What kind of plane?

24  A     Can I -- I believe they thought it was a Coast Guard

25  plane.

DIRECT EXAMINATION OF TIMOTHY CAMPBELL

1   Q    At some point did you have an opportunity to interview

2   Mr. Meighan in this case?

3   A    Yes, sir.

4   Q    Now, let's first talk about his first interview with

5   federal agents.  Did he tell the truth during that interview?

6   A    He started off -- no, sir.

7   Q    What did he say to federal agents, essentially?

8   A    I would have to -- can I refresh --

9        MR. DEE:  He said that they believe it was not the

10  truth.

11       THE COURT:  I'm sorry.  What?

12       MR. DEE:  I'm going to object to the relevance of

13  going into his first interview as to whether it was true or

14  not.  I think it's just way too broad of a question as far as

15  what did he say that wasn't true.

16       THE COURT:  Overruled.

17  A    May I refresh?

18  BY MR. DeRENZO:

19  Q    Please.

20  A    Yes, sir.

21  Q    So what was his initial story to law enforcement about

22  why he was on that vessel?

23  A    That two individuals named Chico and Denverd (phonetic)

24  had paid for him to travel to Cartagena to get on a boat.

25  Q    And did he provide any sort of cover story regarding

DIRECT EXAMINATION OF TIMOTHY CAMPBELL

1  fishing or diving, as you recall?

2  A    Yes.  He discussed that he was going to be going on a

3  fishing trip.

4  Q    Okay.  Did he mention whether or not that vessel ran into

5  any trouble, was at some point out of fuel?

6  A    Say that one more time, sir.

7  Q    Yeah.  Do you recall if Mr. Meighan mentioned that the

8  vessel he was on, allegedly fishing, at some point ran out of

9  fuel?

10 A    In the first statement, if I may.  Can I refresh again?

11 Q    Of course.

12 A    There's a lot of interviews here.

13        If you are referencing their trip that they took and

14 they ran out of fuel, yes, sir.

15 Q    So his statement to law enforcement was they ran out of

16 gas.  Did they mention that they were drifting for six days?

17        MR. AMADOR:  Leading.

18        THE COURT:  It is leading.

19        MR. DeRENZO:  Withdrawn, Your Honor.

20 BY MR. DeRENZO:

21 Q    Special Agent Campbell, do you recall whether or not he

22 mentioned what happened after the vessel ran out of fuel?

23 A    What specifically, again, I would have to --

24 Q    Take as much time as you need.

25        Let's talk instead about his first debrief with you.

DIRECT EXAMINATION OF TIMOTHY CAMPBELL

1  When he first talked to you, did he tell you exactly what

2  happened or did he stick to the initial story that he told the

3  investigating agents following his arrest?

4  A    He stuck with his initial story at first, yes, sir.

5  Q    Okay.  And then after that, did he eventually tell you

6  some more details about the operation?

7  A    Yes, sir.  We confronted him that we couldn't believe his

8  story.  And then he changed and told a different version of

9  the story.

10        THE COURT:  Is it still the first debrief or some

11 other time?

12        THE WITNESS:  The first debrief, ma'am.  After some

13 time we stopped and told him this couldn't be true, and he

14 changed his story.

15 BY MR. DeRENZO:

16 Q    In all -- and how many interviews did you do with

17 Mr. Meighan?

18 A    I don't want to get this wrong, but I believe five total

19 between pre and post arrest.

20 Q    Okay.  And then in all of those interviews --

21 A    Post trial.  Sorry.

22 Q    In all of those interviews, did he ever make a claim

23 about how much he was paid to participate in this operation?

24 A    The only thing he came up with was he was told that he

25 would be paid enough money to purchase a fish camp, which he

DIRECT EXAMINATION OF TIMOTHY CAMPBELL

1  said would be somewhere around 9,000 Belizean dollars, which

2  comes out to be about 4,400 U.S. dollars.

3  Q    And when you asked him about him traveling from Belize to

4  Colombia, what was his -- what did he say about his knowledge

5  about the operations?

6  A    He said he originally believed when he left Belize that

7  he was coming to get a boat that was going to be -- he was

8  going to help drive from Cartagena to Belize.  It was going to

9  be refitted for a dive operation, that he would work on the

10 dive boat.

11 Q    So did that information include any knowledge about this

12 being a cocaine -- maritime cocaine operation?

13 A    Not at that time, no, sir.

14 Q    According to Mr. Meighan, when was the first time he

15 learned that he was going to be involved in trafficking on a

16 boat?

17 A    When he met the other Colombians other than the captain

18 at the camp that they staged at.  They arrived.  He made a

19 statement that -- he said that he said to one of them, is this

20 a drug trip, and then they laughed at him.

21 Q    At any point during your several interviews with

22 Mr. Meighan, did he admit to being a representative, or the

23 term we've used here in court today, the load guard for a

24 Central American drug trafficking group?

25 A    No.  No, he did not.

DIRECT EXAMINATION OF TIMOTHY CAMPBELL

1  Q    Did he ever corroborate the statements made by

2  Mr. Hinestroza-Newbbooll about how much he was being paid?

3  A    No, he did not.

4  Q    Did you at any point confront him with what

5  Mr. Hinestroza said --

6  A    I did.

7  Q    -- with respect to him being introduced as the load

8  guard?

9  A    Yes, sir, I did.

10  Q    What was his response?

11  A    One, he said that he didn't speak Spanish and that the

12  two were speaking in Spanish and that he did not -- he was not

13  a load guard.

14  Q    At any point during your conversations with Mr. Meighan,

15  did he disclose the amount of bales onboard the vessel or the

16  amount of drugs involved?

17  A    No, sir.

18       MR. DeRENZO:  Thank you, Your Honor.  I have no

19  further questions for Mr. Campbell.

20       THE COURT:  I have a couple of questions.

21       As it pertains to his last question, did you ask him

22  about the amount of bales or drugs onboard the vessel?

23       THE WITNESS:  I would have to look.  I don't recall

24  for sure, ma'am.

25       THE COURT:  You can look.

DIRECT EXAMINATION OF TIMOTHY CAMPBELL

1      THE WITNESS:  The best answer, he did not know the

2  exact amount, but he believed there were 20 or more bales.

3      THE COURT:  You may have mentioned this.  As far as

4  debriefing, how many times did Mr. Meighan debrief?

5      THE WITNESS:  Between post trial and pretrial?  I

6  believe three pre and two post trial, ma'am.

7      THE COURT:  The two post-trial briefs --

8      THE WITNESS:  Yes, ma'am.

9      THE COURT:  -- you indicated you did not think he was

10 completely truthful about everything.  What did you not think

11 he was completely truthful about?

12     THE WITNESS:  The one part, ma'am, that is -- well,

13 there's two things, but one is him leaving Belize not knowing

14 it was a drug transportation operation.

15     THE COURT:  Okay.

16     THE WITNESS:  Specifically just the nature of how

17 things transpired, meeting someone, being driven to a hotel,

18 staying, having different people coming to the hotel, meeting

19 people you never met before.  They had conversations about the

20 waters in Belize and if he knew the waters in Belize during

21 that first meeting.  I found that difficult to believe that

22 one would not know what the purpose he was there for, ma'am.

23     THE COURT:  Okay.  You said that was one thing.  What

24 was the second thing?

25     THE WITNESS:  Never knowing how much you were paid or

CROSS EXAMINATION OF TIMOTHY CAMPBELL

```
 1  not given an amount.
 2          THE COURT:  And you did ask him how much he was paid?
 3          THE WITNESS:  Oh, yes, ma'am.  Several times.
 4          THE COURT:  Thank you.
 5          Mr. Dee, do you have any questions?
 6          MR. DEE:  I do, Your Honor.
 7                    CROSS-EXAMINATION
 8  BY MR. DEE:
 9  Q    Good morning, Special Agent Campbell.
10  A    Good morning, sir.
11  Q    Special Agent Campbell, in your interviews with
12  Mr. Meighan post trial --
13  A    Yes, sir.
14  Q    Okay.  I'm going to ask you a question about that.
15  Mr. Meighan did advise you that he was the person that was
16  going to get them into the Belizean waters; is that correct?
17  A    He did, yes, sir.
18  Q    And he advised that there was a shallow reef off Belize
19  and there was a port of entry, that they needed to go between
20  the Turneffe Island and Glover's Reef?
21  A    Yes, sir.
22  Q    And that the lighthouse there most of the time was not
23  working.  So if they went in at dark, it would be very
24  difficult to get in?
25  A    Yes, sir.
```

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1   Q    And that he acknowledged he knew those waters and that's

2   what he was going to do is help them get into the Belizean

3   waters?

4   A    Yes, sir.

5   Q    He also acknowledged to you that once they got into the

6   Belizean waters, there would be an exchange of boats or

7   something.  The load would be removed from the boat they were

8   on?

9   A    That is what he told us.  Yes, sir.

10  Q    And, of course, all that was pending if they had

11  successfully been refueled at sea and made it to Belize?

12  A    Yes, sir.

13  Q    And then he told you that he believed the load then would

14  probably be headed to the Mexico-Belize border?

15  A    That's what he said, yes, sir.

16  Q    Now, he never said he was the load guard, but he did

17  acknowledge all of those facts?

18  A    Yes, sir.

19  Q    Now, as far as pay, when you asked him what he was going

20  to be paid, he said he was going to be paid enough to purchase

21  or open up a fish camp on an island his grandmother owned?

22  A    Yes, sir, he did.

23  Q    And that his pay would be upon return to Belize?

24  A    Yes, sir.

25  Q    Now, you were asked some questions about Mr. Hinestroza's

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1  interview.  Do you still have that in front of you?

2  A    Mr. Hinestroza's interview?

3  Q    Yeah, Mr. Hinestroza-Newbbooll.

4  A    Yes, sir.  I have that in front of me.

5  Q    Before I go into Mr. Hinestroza -- I'm sorry to backtrack

6  here, but other than the two things that you mentioned, the

7  not acknowledging or knowing that it was a cocaine venture

8  until he got to Colombia and not acknowledging direct pay for

9  this thing, did you believe all the other information that

10  Mr. Meighan gave you?

11  A    Yes, sir.

12  Q    Now, let's go to Mr. Hinestroza's interview.  On page 3

13  of Mr. Hinestroza-Newbbooll's report or interview, and I'm on

14  the first paragraph but one, two, three, four, five, six lines

15  down.  Starts with, "While at the apartment."

16  A    Yes.

17  Q    In that statement, does Mr. Hinestroza state that he was

18  told the offload destination was Honduras but that Meighan

19  told him they were going to Belize and then to Jamaica?

20  A    Yes, sir.  That's the statement he told me.

21  Q    Did you believe that that's what they were doing was

22  going to Jamaica?

23  A    That doesn't seem likely.

24  Q    But that's what Mr. Hinestroza-Newbbooll said Mr. Meighan

25  told him?

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1   A    Yes, sir.

2   Q    And then he continued.  It says,

3   "Mr. Hinestroza-Newbbooll continued to tell Meighan that he

4   was contracted to take a load to Honduras, and Meighan again

5   told him Jamaica."

6   A    Yes, sir.

7   Q    Now, in all of your interviews with Mr. Meighan, did he

8   ever say the load was going to Jamaica?

9   A    No, sir.

10          THE INTERPRETER:  The interpreter requests repetition

11  on the question.

12          MR. DEE:  I'm sorry.

13  BY MR. DEE:

14  Q    In all of your interviews with Mr. Meighan, did he ever

15  say a load was going to Jamaica?

16  A    No, sir.

17  Q    So Mr. Hinestroza-Newbbooll was either mistaken or not

18  telling the truth at that point?

19  A    Or there's a chance that I miswrote the statement.  Yes,

20  sir.

21  Q    Now, let's go to page 5 of that interview.  And the very

22  last sentence or last paragraph, it says -- it looks like it's

23  a misspelling of Meighan.  Correct?

24  A    Yes.

25  Q    Told Hinestroza-Newbbooll he was going to be paid 50,000

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1    in Belizean dollars.  He did not know if Meighan had already

2    been paid.

3    A    Yes, sir.  That's what he said.

4    Q    That statement is Mr. Hinestroza-Newbbooll again telling

5    you what he says Meighan told him?

6    A    Yes.

7    Q    And he also says Meighan told him the load was going to

8    Jamaica?

9    A    He did.

10            MR. DEE:  No other questions, Your Honor.

11            THE COURT:  Mr. Brunvand.

12            MR. BRUNVAND:  Very briefly, Your Honor.

13                         **CROSS-EXAMINATION**

14   BY MR. BRUNVAND:

15   Q    Good morning.

16   A    Good morning, sir.

17   Q    You were asked on direct examination about my client,

18   Mr. Newball May, admitting to a number of bales of cocaine

19   being on the vessel?

20   A    Well, he was still saying they were conch, but yes, sir.

21   Q    Right.  That's my question.  My client, Mr. Newball May,

22   at no point in time did he ever say that he had knowledge that

23   there was cocaine on the boat?

24   A    No, he did not.

25   Q    He always referred to it as?

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1    A     Conch.

2    Q     Okay.  During direct examination, you were asked about

3    the wholesale value of a kilogram of cocaine.  And I believe

4    you said 30,000?

5    A     30,000 a kilogram, yes, sir.

6    Q     And that's the wholesale value of a kilo of cocaine in

7    the United States?

8    A     Yes, sir.  Well, here in this area.

9    Q     In this area?

10   A     Yes, sir.

11   Q     And that's a wholesale value that fluctuates.  Sometimes

12   it goes up as high as 40.  Would you agree?

13   A     It does fluctuate.  I would not know the direct answer to

14   that.

15   Q     So 30,000 is a figure that you're comfortable with.

16   Right?

17   A     Yes, sir.

18   Q     So would it be fair to say that at that rate, based on

19   the estimated amount of 760 kilograms of cocaine, that it

20   would be worth about $22.8 million at that rate?

21   A     I believe that's -- I would have to look at my notes.  I

22   wrote it down, but I think that's correct.

23   Q     Okay.  And certainly above $22 million.  Right?

24   A     Yes, sir.

25   Q     And I believe you indicated that Mr. Newball May had

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1    indicated that he -- no, not Mr. Newball May, but someone else

2    had indicated that Mr. Newball May was going to get 11,000

3    prior to the trip.  Correct?

4    A    He had already received that prior to the trip.

5    Q    Sure.  Right.  Received it prior to the trip?

6    A    Yes, sir.

7    Q    And then if the trip was successful, he would receive

8    another 11,000 at the end?

9    A    I believe actually a little more than that.  But yes,

10   sir, about double the amount.

11   Q    So approximately $22,000?

12   A    U.S. dollars, yes, sir.

13   Q    Which, would you agree, $22,000 is about one-tenth of

14   1 percent of $22 million?

15   A    Yes, sir.

16   Q    And presumably a large chunk of the $22 million, plus,

17   minus, would be going to Colombia?

18   A    I would assume so, yes, sir.

19   Q    Okay.  And it wouldn't be going to my client?

20   A    I don't believe there's profit sharing, no, sir.

21            MR. BRUNVAND:  Thank you.  That's all I have.

22            THE COURT:  Mr. Amador?

23            MR. AMADOR:  Thank you.

24                          **CROSS-EXAMINATION**

25   BY MR. AMADOR:

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1   Q    Agent Campbell, if you would please look at Mr.-- well,

2   let me ask the question first.  You said that Mr. Newball May

3   told you that when they saw the plane they were concerned that

4   it was the Coast Guard; is that right?

5   A    He didn't tell me.  He told the other agents, yes, sir,

6   in his post-arrest statement.

7   Q    But when he said it was the Coast Guard, he said it was

8   the Colombian Coast Guard that he was concerned about; is that

9   right?

10  A    I do not know the answer to that question.  I'd have to

11  look.

12  Q    Please refresh your recollection.

13  A    You are correct, sir.  He did say Colombian Coast Guard.

14  Q    And I want to go back to Mr. Hinestroza.  In his initial

15  interview, he told the agents, I'm the one that knows

16  everything.  The other people, the other crew members don't

17  know anything.  Right?

18  A    I don't think that was -- I have his statement, but it

19  wasn't that.  It was, I'm the captain.  I know more than

20  everyone else, I believe is the statement.

21  Q    Suggesting that the other individuals on the boat knew

22  much less than he did?

23  A    Well, he's the captain.  So yes, sir.

24          MR. AMADOR:  Nothing further.

25          THE COURT:  Any redirect, Mr. DeRenzo?

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1          MR. DeRENZO:  No, Your Honor.  Thank you.

2          THE WITNESS:  Thank you, ma'am.

3          THE COURT:  Mr. DeRenzo.

4          MR. DeRENZO:  Thank you, Your Honor.

5          I'll start with the issue of the drug quantity.

6    Largely, Your Honor, my argument is laid out in my sentencing

7    memorandum, but I want to highlight a couple of things in

8    response to what my colleagues have argued here this morning.

9          I think the crux of their argument is the Court would

10   have to engage in mere speculation.  Certainly I think the

11   case law is such that that's not appropriate.  But as I've

12   laid out in my brief, in a case like this where there is no

13   seizure, the guidelines specifically state that the Court

14   shall approximate the amount of drugs involved.  And so the

15   question is how does the Court do that.

16         This case is not like some of the other cases that

17   are illustrated in the guidelines where we are using witnesses

18   that talk about, you know, the amount of drugs a laboratory

19   can produce over a period of time and then we're just doing

20   math.  This case is different, but I don't believe that the

21   Court is required to speculate.

22         THE COURT:  What should I rely on for drug quantity?

23         MR. DeRENZO:  I think the Court has three options.  I

24   think my suggested approach is to start with the captain's

25   statements to law enforcement.  As we heard from Special Agent

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1    Campbell, he said there were 38 bales, 760 kilograms.  I don't

2    think it's any coincident when you do the math there that's

3    20 kilograms per bale, which is entirely consistent with the

4    testimony we've heard from several Coast Guard officers who

5    were present in the courtroom.  It's consistent with --

6              THE COURT:  You mean who testified at trial?

7              MR. DeRENZO:  Yes, Your Honor.  And what they

8    testified to, just to reorient the Court, that these bales are

9    very consistently packaged in single kilogram bricks, ten

10   bricks per stack and two stacks in a bale.  And that's why we

11   see such consistency in the bales themselves.  That's

12   consistent with Special Agent Campbell's testimony here today

13   about how in the thousands of bales he has personally

14   processed, he's never seen a single one under 20 kilograms.

15             I suggest to the Court that's 20 kilograms of powder.

16   An individual bale, when weighed, if you just take a bale and

17   put it on a scale, it's going to be over 20 kilograms because

18   you have packaging and whatnot.  And of course when these

19   kilogram-size bricks are making their way into Central

20   America, they're not going to unload it all, weigh it so they

21   figure out how much they need to be -- how much they owe for

22   the drugs.  So what they do is count the bricks.

23             THE COURT:  Let me go through.  The captain in his

24   statements or his debriefing, or I don't know if it was the

25   debriefing post-arrest statements, said there were 38 bales

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1    onboard.  Correct?

2            MR. DeRENZO:  Yes, Your Honor, 38 bales.  And he

3    provided a weight, 760 kilograms.

4            THE COURT:  He didn't say how many kilos were in each

5    bale.  He just provided a total amount.

6            MR. DeRENZO:  Correct, Your Honor.

7            THE COURT:  Okay.  Go ahead.

8            MR. DeRENZO:  And what was helpful from Special Agent

9    Campbell's testimony was we know a little bit about the

10   context of Mr. Hinestroza's brief.  It was lengthy.  It was

11   detailed.  He was extremely cooperative, and it was certainly

12   far more detailed than his co-Defendants.

13           I would suggest to the Court that him being the

14   captain matters because he is going to know how much is on the

15   boat.  That adds another aspect of the reliability of his

16   statement and of course the context in which he is giving it.

17           He is at that point cooperating, and it's in his best

18   interest to provide as much truthful information to the

19   Government as possible.  Of course, he was represented by

20   counsel at the time.

21           THE COURT:  The witnesses that -- I'm going to come

22   back to him in a moment.  The witnesses that you earlier said

23   that testified in trial that said there were normally 20 kilos

24   in a bale, were those -- and I can't remember exactly.  I can

25   remember the testimony -- 20, were those Coast Guard

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1  witnesses?

2       MR. DeRENZO:  Yes, Your Honor.  We heard from both

3  the Coast Guard boarding team based on their experience in

4  both, you know, the at-sea encounters with cocaine bales and

5  then in offloading the bales of cocaine once the ship makes

6  its way into port.  I can recall, I believe it was Chief

7  Brooks was one of those witnesses.  And he went into detail

8  about why they are so consistent in size.  And they talked

9  about the 20-kilogram size versus the 40-kilogram size.

10       We also heard from Special Agent Ray with Coast Guard

11  Investigative Services.  He mirrored that same testimony with

12  respect to the way cocaine bales are typically packaged.

13       And to get from the general to the specific, multiple

14  Coast Guard witnesses when looking at, I believe it was

15  Government Exhibit 2Q at trial, which was sort of a collection

16  of the various shots of the cocaine bales floating in the

17  water, what they testified to was that what they saw in that

18  video, which is the cocaine we're talking about, was

19  consistent with the 20-kilogram size bales that they have

20  encountered in their careers.

21       So moving from there, you know, I think you start

22  with Hinestroza.  And then if you wanted to be extremely

23  conservative, you can use the estimate provided by Mr. Newball

24  May.  He was truthful on some of what he said, but he stuck to

25  his story about diving for conch.  Obviously the jury rejected

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1  that claim when they found him guilty, but he says it is
2  consistent with the hours of video we saw, two strings, 15 to
3  17 sacks or bales.
4         Doing the math, that's 30 to 34 bales.  If you
5  multiply that by 20 kilograms, conservatively we're at
6  600 kilograms of cocaine.  Either way we are over the
7  threshold for base offense level 38.
8         THE COURT:  Mr. DeRenzo, I am assuming that Captain
9  Hinestroza-Newbbooll -- or is it Newbbooll-Hinestroza?
10        MR. DeRENZO:  Hinestroza-Newbbooll, Your Honor.
11        THE COURT:  Hinestroza-Newbbooll is no longer
12 debriefing or cooperating.
13        MR. DeRENZO:  Not today, Your Honor.
14        THE COURT:  Okay.  And I say that because the last
15 that I knew, he intended to go to trial.  All right.  Thank
16 you.
17        MR. DeRENZO:  So I think we have multiple layers here
18 of corroboration in terms of the Court finding that this
19 hearsay statement is reliable.
20        And then finally, I think the extra piece is really
21 just looking at the trial exhibits themselves.  We sat here
22 probably longer than the Court wanted to, but for hours
23 watching these videos of the cocaine bales floating around the
24 ocean.  And I actually brought my laptop today.  If the Court
25 wants, we can watch the video.

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1          THE COURT:  I watched them yesterday.  Not all of

2    them.  I skipped through a lot of clouds, but I looked at

3    them.

4          MR. DeRENZO:  Yes, Your Honor.  But in my estimation

5    when I do the count -- there are various angles, some are

6    better than others, and I recognize the C-130 is several

7    thousand feet in the air, but you can see at various moments

8    what a single bale looks like and you can begin to count.

9          At times you can see a bale splashing in the water.

10   It makes a big splash, what you would expect from something

11   that weighs 40 or 50 pounds, which is what a 20-kilogram bale

12   of cocaine is.

13         So when you count the bales, you see that you're, by

14   my count, over 30.  You see the two strings.  And so my

15   argument is that it's not speculation.  You are relying on

16   reliable hearsay from a co-conspirator who is in a position to

17   know this information, who provided it in an appropriate

18   setting, had a truthful demeanor, and it's corroborated by the

19   independent evidence admitted at trial.

20         Just give me one moment, Your Honor.

21         I cited some cases here on pages 5 and 6 of my memo

22   that talk about the Court's ability and the appropriateness of

23   relying on statements like we have provided here this morning.

24   Some of those were just in the PSR.  Here we provided some

25   more detail about the co-Defendant's demeanor and the setting

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1 in which he provided this information.

2       Pending any further questions from the Court on that

3 issue, I will move to the obstruction issue.

4       THE COURT:  All right.

5       MR. DeRENZO:  My reading of the guidelines and the

6 cases cited in my memo are -- there's two possibilities here.

7 Either it's contemporaneous with arrest, in which case we have

8 to show actual hindrance, or it's not contemporaneous, in

9 which case we do not have to show actual hindrance.  And that

10 has been clarified by the Eleventh Circuit as I've discussed

11 in my memo.

12       One of the issues raised was whether or not there was

13 an actual investigation commenced at the time that they

14 engaged in the obstructive conduct.  Well, again, this is --

15 I'm trying to find the cite here, Your Honor.  But the

16 Eleventh Circuit has decided and clarified that it's not --

17 there is no requirement that the Defendant's obstructive acts

18 occur subsequent to the formal commencement of an

19 investigation.  That's on page 8 of my memo.  And that's from

20 *United States v. Garcia* which I previously cited, which is a

21 2000 Eleventh Circuit decision.  So it doesn't matter if a

22 formal investigation had commenced.  What matters is the state

23 of mind of the actors in the obstructive conduct.

24       Here I can't think of a more clear-cut example of

25 obstructing justice in a drug investigation.  As I believe it

1  was the Massey case says, it's self-evident that illegal drugs

2  are material to an investigation or prosecution in a drug

3  case.  I think that is self-evident.

4       So if we are -- my first argument is that this

5  conduct occurred prior to their detainment by the Coast Guard.

6  It was, I believe, the testimony at trial, and the evidence

7  admitted at trial showed that this occurred several hours

8  before the Coast Guard boarding team even arrived, much less

9  when they actually detained them.

10       As the Court noted earlier, this was a very

11  deliberate, lengthy evolution that took all individuals on the

12  boat, all of their efforts to achieve.  And so I think just

13  temporally it did not occur contemporaneous with an arrest.

14       The Eleventh Circuit has decided that if it doesn't

15  occur contemporaneous with arrest, there's no required showing

16  of actual hindrance.  So it doesn't matter if it actually

17  hindered our investigation, but I think either way we get to

18  the same result, and that's that the obstruction of justice

19  adjustment is appropriate.  Because even if we assume this is

20  all sort under the umbrella, if you will, of the eventual

21  detainment and arrest of the Defendants, there was actual

22  hindrance.  The fact that we are sitting here talking about

23  the drug quantity is perhaps the most obvious basis for

24  concluding that.

25       You know, the Defendants talked about the fact that

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1   they had -- there might have been other information, they were

2   successful in convicting of the Defendants.  None of that

3   really matters.  The word "hindrance" doesn't mean an

4   insurmountable obstacle.  Otherwise, we wouldn't be talking

5   about sentencing at this point.  Hindrance just means that it

6   created an obstacle to overcome.

7           I think given how we had to present the evidence at

8   trial, as opposed to a typical boat case, it's obvious that

9   there were obstacles we had to overcome.  Notably, the actual

10  hindrance can affect the investigation, prosecution or

11  sentencing.  So whether we are talking about the drug quantity

12  that we are discussing here today or the fact that we didn't

13  have drugs to produce at trial, we weren't able to bring a

14  forensic chemist in and say, yeah, that white powdery

15  substance sitting on the witness stand is in fact cocaine.  We

16  weren't able to inventory the cocaine.  All of these things

17  you typically see in a boat case prosecution we weren't able

18  to do.  And we were never able to replace that evidence even

19  though we were ultimately successful in convicting the

20  Defendants.

21          And so my argument is that whether you want to use

22  the contemporaneous with arrest analysis or decide it's not

23  contemporaneous, the result is the same.

24          THE COURT:  Let me ask you a question.

25          MR. DeRENZO:  Yes.

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1          THE COURT:  Mr. Amador, I believe it was, brought up

2     the issue at the time that the plane was circling, which was

3     when they began jettisoning the bales of cocaine, there was no

4     jurisdiction.  Does that make any difference?

5          MR. DeRENZO:  No, and I wouldn't agree with his

6     claim.  I think jurisdiction exists objectively.  Either it

7     exists or it doesn't.  We go through this process that the

8     Court is aware of to actually determine the factual predicate

9     for the jurisdiction, but either the vessel was stateless or

10    it's not stateless.  And in this case it was stateless.  It

11    wasn't registered in Colombia.  It was not flying a flag, all

12    of that information.  So factually I don't agree with the

13    claim that we didn't have jurisdiction.  We did.  We didn't

14    know it at the time.

15         THE COURT:  But you couldn't board it at that time

16    anyway.

17         MR. DeRENZO:  I think we could have.  I don't think

18    it would have been a problem.  We go through that process so

19    we can make sure we don't board a vessel we shouldn't be on,

20    if it is actually registered in Colombia, for instance.

21         The Coast Guard has a policy that tells the boarding

22    team how to go through that process.  So if they had just

23    boarded without going through the process, it may have

24    violated a Coast Guard policy, but I don't believe it would

25    have violated international law or rendered the vessel not

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1  subject to U.S. jurisdiction.  With that said, I don't believe

2  it matters at all.

3       I mean, it really comes back to what's in the

4  guidelines and how the Eleventh Circuit has decided these

5  cases.  There does not have to be a formal commencement of any

6  investigation.  Although obviously -- you look to the intent

7  of the act.  Obviously, we know why they were throwing the

8  bales overboard, because they saw the Coast Guard plane.

9  There's really no question about what they were doing and why

10 they were doing it and what they were trying to achieve.

11      And so it comes down to was there any actual

12 hindrance.  If you are going to decide it was contemporaneous

13 with arrest or if it was not contemporaneous with arrest, then

14 was it destroying evidence material to the prosecution or

15 sentencing?

16      Pending any question of the Court, I will move to

17 minor role.  And I know the Court has heard argument on this

18 probably hundreds of times at this point.  I have laid out my

19 argument in my brief citing primarily to the De Varon case,

20 which I know the Court is very familiar with, and then the two

21 cases mentioned by Mr. Amador.  One is *U.S. v. Palma-Meza* and

22 *U.S. v. Herrera-Villarreal* which are Eleventh Circuit cases

23 from 2017 and 2016 respectively.

24      At the end of the day, we come back to the guidelines

25 themselves, and it's the Defendant's burden to show that their

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1  respective clients were substantially less culpable than the

2  average participant.

3       We look at the average participant, not the lowest

4  level people, not the highest level people.  And in order for

5  them to meet their burden, I think they need to articulate and

6  actually prove with evidence who is the average participant.

7  They've talked about some people who we don't know their

8  names, we don't know their roles, we don't know what they

9  knew, what they were paid, where they were at in the

10 respective drug trafficking organization.

11      The only evidence we have really other than the

12 Defendants who were on the boat is this testimony from Special

13 Agent Ray that Mr. Amador mentioned.  And he was essentially

14 giving maritime drug trafficking 101 testimony, what do we

15 typically see.  And he isn't able to and we don't have any

16 evidence about the specific people who might -- who were I'm

17 sure involved at a different level than the people seated to

18 my right.

19      That matters because the Court has to decide who are

20 the average participants.  And without having all that

21 information, we have to come back to the people that we do

22 know about, and that's the Defendants themselves.

23      And what De Varon and the other cases that are

24 typically cited -- Cruickshank, I think, was in one of the

25 memos I read.  And the other -- the cases I cited, they all

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1  come back to the Court's role as a very fact-intensive

2  inquiry.  The guidelines after 2015 have given us some

3  nonexhaustive list of factors that the Court can look at.  But

4  my suggestion is when you look at those factors, you apply

5  them to the Defendants, but then you are going to apply them

6  to the other people who you are going to compare the

7  Defendants to.

8       We can't do that with testimony like we have from

9  Special Agent Ray because we just don't know about them.  We

10 would be just speculating about what they know.  You might be

11 recruiting mariners, for instance, but still not know the

12 offload destination.  You might be lower on the chain.  You

13 might have -- you might not get an aggravating role or

14 something like that.

15      There's other people, I submit to you, lower in the

16 food chain, although we don't have any evidence of that,

17 people who are providing logistical support, fueling the

18 vessel, perhaps fixing engines or providing engines, very,

19 very low menial tasks.

20      At the end of day, De Varon stands for the

21 proposition, Number 1, that examining their role in light of

22 the larger conspiracy is inappropriate.  In fact, I think the

23 word they use is the roles with -- that that analysis is

24 essentially irrelevant.  We have to look at this conspiracy.

25 And they are being held accountable.  Their relevant conduct

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1   is identical to their actual conduct.  So that's prong one of

2   De Varon.

3          And the second prong, which I spent most of my time

4   on, there's insufficient evidence in the record for the Court

5   to make that fact-based determination except examining the

6   role, respective roles of the people on the boat.

7          So lastly, what are those roles?  I think well more

8   than the preponderance of the evidence in this case is that

9   Mr. Meighan was the load guard.  I know Mr. Dee takes issue

10  with that, but the vast majority of the evidence in this case

11  suggests that that's true.  This could be the one and only

12  time in Special Agent Campbell's career where that wasn't the

13  case.  But when we are talking about preponderance of the

14  evidence, what's more likely than not, well, what's more

15  likely is that he was the load guard.  He was there for a very

16  specific reason and was likely paid an amount consistent with

17  what Mr. Hinestroza said.

18         If he's a load guard, while we're not seeking any

19  kind of aggravating role, he certainly doesn't have a minor

20  role.  He's not the captain.  He's not in charge of the boat,

21  but he has a very specialized role in this operation.  So

22  consistent with the Palma-Meza case and the Herrera-Villarreal

23  case, he would not be entitled to a minor role adjustment.

24         Mr. Newball May and Mr. Reid-Dilbert, the testimony

25  of Special Agent Ray was typically you're going to have a load

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1   guard, a captain, a mechanic, and one or more mariners.  We

2   don't know for sure whether they were mechanics or mariners,

3   but either way they are in exactly the position that

4   Palma-Meza was in.  Palma-Meza wasn't the load guard, he

5   wasn't the captain, but the Eleventh Circuit pointed out he's

6   in the position to do the same things, more or less, as the

7   other people on the boat.  So he is not substantially less

8   culpable than these people.

9        And that's similar to this case.  It involved a long

10  trip where everybody's got to have their -- you know, take

11  turns driving the boat.  Everybody has got to assist in

12  refueling and ultimately in jettisoning the cocaine.  So my

13  position is that the Defendants have not met their burden to

14  show they are substantially less culpable than their

15  co-Defendants.

16       Lastly, the issue of the safety valve.  At the end of

17  the day -- and I've cited numerous cases in my brief.  At the

18  end of the day, the Defendant's burden is to show that he gave

19  it all up, a hundred percent.  Not 99 percent, not 90 percent.

20  All means all.  And I think that back -- what we know about

21  why we have the safety valve supports that policy.  It's

22  unusual, and you get a big benefit.  Not just the two levels,

23  but the Court can disregard the mandatory minimum.  That is an

24  enormous benefit in many cases and is potentially in play in

25  this case.

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1          And as I cited in some of the later cases I cited,

2     Defendants have a choice.  And I recognize it's a difficult

3     choice, but it's a choice nonetheless.  Many people debrief.

4     They provide some of the information.  I'm told by the agents

5     sometimes truth is a process with these folks, whether it's

6     cultural or whether it's based on fear, understandable fear

7     about what could happen if they, you know, tell us everything

8     about what their role is and then by extension who hired them

9     back in Colombia, or Belize in this instance.

10          In the case of Mr. Meighan, he was not truthful,

11     unfortunately, about his role as the load guard.  It simply

12     strains credibility, common sense and is clearly inconsistent

13     with the experience of Special Agent Campbell that he found

14     himself in Cartagena, Colombia, had to travel through several

15     countries completely unaware of the fact that this was a

16     drug-smuggling operation.  It's inconsistent with what

17     Hinestroza, the captain, told us about his role.

18          And if the Court is in a difficult position making

19     these credibility determinations of who is telling the truth

20     and who is not, at the end of the day you come back to the

21     burden.  If the Court is left with the conclusion that, well,

22     I can't tell, I'm not sure, I can't say that they've shown

23     more likely than not he told the 100 percent honest truth,

24     then the answer is he is not entitled to safety valve.

25          THE COURT:  Well, and you are not making such a

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1   recommendation?

2          MR. DeRENZO:  I'm not, Your Honor.

3          I mentioned Mr. Reid-Dilbert in my sentencing memo as

4   far as a safety valve objection.  Based on what Mr. Amador has

5   represented, I won't address that since he's not contesting

6   it.

7          Pending any questions, that's it, Your Honor.

8          THE COURT:  Not at this time.  Thank you.

9          MR. DeRENZO:  I'm sorry, Your Honor.  I have one

10  other thing --

11         THE COURT:  Okay.

12         MR. DeRENZO:  -- I did mention that Mr. Dee brought

13  up, and that's the acceptance issue.

14         THE COURT:  Oh, yeah.

15         MR. DeRENZO:  He did cite to one comment in the

16  guidelines, but -- and I will find the note, Your Honor.  But

17  the other comment says essentially that as a general principle

18  a Defendant who puts the Government to its burden of proof is

19  not entitled to acceptance of responsibility.

20         The guidelines go on to say that they are not

21  categorically excluded.  It's not -- there is a possibility

22  that they could get it, but that is the rare exception.  And

23  the examples they give is if a Defendant is not contesting his

24  factual guilt but he's just trying to preserve a purely legal

25  issue, jurisdiction or some other -- the constitutionality of

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1   a statute and he --

2         THE COURT:  Ruling on a motion to suppress or

3   something.

4         MR. DeRENZO:  Yes, Your Honor.  And I think that's

5   what the guidelines contemplate, in those rare instances that

6   the Defendant may, not must, but may be eligible for

7   acceptance.  And it's notable that sometimes even people are

8   ineligible for acceptance even if they plead guilty.  Simply

9   pleading guilty doesn't automatically qualify you for

10  acceptance, although routinely it's not opposed and it's given

11  by the Court.

12        But in a case like this based on cross-examination,

13  arguments submitted by counsel, all indications are that

14  Mr. Meighan was contesting his factual innocence, and

15  therefore acceptance of responsibility adjustment would be

16  inappropriate.

17        Thank you.

18        THE COURT:  Thank you.

19        I'm sorry.  I'm going to have to take -- let's take a

20  short recess until 11:00.  And we will start back up at 11:00.

21      (Recess taken from 10:46 a.m. until 11:00 a.m.)

22        THE COURT:  I'm sorry.  Mr. DeRenzo, I have one last

23  question to ask you.  And this has to do with the safety

24  valve, and we have concentrated mostly on Mr. Meighan.  And I

25  just want to make sure I'm clear about Mr. Meighan.  And then

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1    I have a question again regarding safety valve about

2    Mr. Reid-Dilbert.

3            You said that Mr. Meighan debriefed -- I wrote this

4    down -- a total of five times.  I believe that's what I wrote

5    down.

6            MR. DeRENZO:  I believe that was Special Agent

7    Campbell's testimony.

8            THE COURT:  And how many were after trial?

9            MR. DeRENZO:  Two, I believe, Your Honor.

10           THE COURT:  Two.  And you said you did not think he

11   was entirely forthcoming based on he never would admit to

12   exactly how much he was paid, nor would he admit to being the

13   load guard.  Would that be accurate?

14           MR. DeRENZO:  Yes, Your Honor.  It was my position

15   that what he told us with respect to his role was inconsistent

16   with what we learned from the captain, Mr. Hinestroza.

17           THE COURT:  Well, inconsistent in some manner other

18   than being the load guard?

19           MR. DeRENZO:  No.  Just those two issues, Your Honor.

20   It just wasn't my belief.  There was evidence to the contrary.

21           THE COURT:  And Mr. Reid-Dilbert, he debriefed how

22   many times?

23           MR. DeRENZO:  May I check with Special Agent

24   Campbell?

25           THE COURT:  Sure.

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1        MR. DeRENZO:  He had a post-arrest interview and then

2   two debrief sessions with Special Agent Campbell.

3        THE COURT:  Before trial?

4        MR. DeRENZO:  Before trial, yes.

5        THE COURT:  And you thought he was not entirely

6   forthcoming for what reasons?

7        MR. DeRENZO:  Although I didn't elicit any testimony

8   that was given, Mr. Amador's seeming nonopposition to the

9   issue, in talking with Special Agent Campbell --

10        THE COURT:  Well, I think there's a problem because

11   it occurred prior to trial, too, but go ahead.

12        MR. DeRENZO:  The basis was essentially his demeanor

13   as compared to, frankly, Mr. Meighan and Mr. Hinestroza was

14   completely combative.  It was like pulling teeth essentially

15   to get any information.  Every time they tried to drill down

16   an issue -- for example, he would describe an individual that

17   was involved back in Colombia, someone he was riding with,

18   someone he was spending time with, and he would just go, I

19   don't know, I don't know, that kind of thing.

20        THE COURT:  All right.  Thank you.  Those are my only

21   two questions.

22        All right.  Let me go through -- I will try to do

23   this one at a time and rule on the objections starting with --

24        MR. AMADOR:  Your Honor --

25        THE COURT:  And some of the rulings are clearly going

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1   to apply to more than one Defendant.

2        MR. AMADOR:  Your Honor --

3        THE COURT:  Starting with Mr. Meighan, the first

4   objection is to -- and this was an objection raised, I

5   believe, by the other two Defendants -- the amount of drugs

6   that he should be held accountable for, which obviously drives

7   the base offense level.  The probation office has suggested it

8   should be a level 38, which is 450 kilos or more.

9        I believe the objection by the Defendants is that the

10  jury found that the Defendants were responsible for

11  5 kilograms or more, and it should be a level 30, which is the

12  5 to 15.  And I'm going to overrule the objections and find

13  that the probation officer has properly scored this for a

14  number of reasons.

15       And the first is, as we know, the captain in this

16  case, who is admittedly still pleading not guilty and is set

17  for trial, Mr. Hinestroza-Newbbooll has said or debriefed or

18  gave a post-arrest statement that the boat had 38 bales and

19  there was a total of 760 kilograms.

20       In addition, we had the video which clearly showed a

21  number of bales being attached to two ropes and then

22  eventually being sunk.  And there has been testimony by the

23  agents, the Coast Guard representatives, Agent Campbell

24  testified he had never seen a bale less than 20 kilos.  The

25  Coast Guard at trial testified it was normally 20 kilos in a

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1    bale.  That coupled with clearly on the video that -- you may

2    not have been able without stopping the video to count the

3    individual bales, but I think it's certainly reasonable to

4    believe that there were 38 bales or 35 bales, certainly a

5    sufficient amount of bales, each containing 20 kilos of

6    cocaine, to find that the amount here is more than 450 kilos.

7    So I'm going to overrule that objection.

8           The next objection --

9           MR. AMADOR:  Your Honor?

10          THE COURT:  Yeah.

11          MR. AMADOR:  I'm sorry.  I tried to get your

12   attention before.  I do have -- if I may be heard, I'd like to

13   make some rebuttal or reply to some of the arguments that

14   Mr. DeRenzo made.

15          THE COURT:  Mr. Amador, all right.  Go ahead.

16          MR. AMADOR:  Thank you.

17          Judge, first, Mr. DeRenzo says that there aren't any

18   discernible people other than the four people that are on this

19   boat with regard to the minor role argument, but in his own

20   argument about Mr. Meighan and whether he is entitled to

21   safety valve or not says he was given instructions about how

22   and where to drop off the drugs and where to take the drugs.

23   He was taken -- he was sent from Belize to Colombia to meet

24   with these people.  There are clearly other people involved in

25   this case.

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1          I don't -- I can't imagine that the Court believes
2   that there aren't other people like the people that own this
3   drug that has been said here is $22.8 million at the street
4   level, that these three people that are basically very, very
5   poor, paid very, very little.  Mr. Meighan wants to use the
6   money to buy a fish camp.
7          THE COURT:  I don't disagree there are other people
8   "involved" with the case.  I mean, someone owned the drugs
9   involved.  Somebody was supposed to receive the drugs.
10  Somebody sent the drugs.
11         MR. AMADOR:  And I'm just pointing that out because
12  Mr. DeRenzo's argument was that this conspiracy -- I felt that
13  his argument was that this conspiracy only involved these
14  people.
15         With respect to jurisdiction, when you were asking
16  about that, I don't think that jurisdiction just is out there.
17  In fact, if it were, why do they have to get approval from the
18  State Department?  They have to get -- in fact, Document 74-1
19  is the certification that they have to get from the Department
20  of State.  And in it, it says that they had to contact the
21  government of Colombia to determine whether there was
22  jurisdiction.
23         So I might -- I would submit to the Court that that's
24  an issue.  And I think that what I was saying with respect to
25  that should have some bearing.  And frankly, Judge, I think

1  that it seems like the Eleventh Circuit in the cases that I

2  have reviewed other than the one that I cited, Savard, seems

3  like there is almost anything that a Defendant does can be

4  construed to be -- other than maintaining his rights can be

5  construed to be obstructive.

6          Thank you.

7          THE COURT:  Okay.  Moving on from the issue of drug

8  quantity, as far as mitigating role, I'm also going to

9  overrule that objection finding, Number 1, that the Defendants

10 are held accountable only for the drugs that they jettisoned

11 off of the vessel that had originally been on the vessel, no

12 more that might be alleged in a huge conspiracy where you

13 charge the people that own the drugs and the people that

14 receive the drugs and all that kind of thing.

15         In addition, there is not one of them that I can

16 think of -- there's allegations that Mr. Meighan is the load

17 guard here or there's suggestions from the Government that he

18 is the load guard here.  I'm not sure his role is any -- other

19 than he knew where to go, any less or any more than any of the

20 other people on the vessel.

21         Clearly the captain, if he ever pleads or goes to

22 trial, is convicted will get a two-level increase, but I'm not

23 going to find that any of the Defendants were substantially

24 less culpable than the other three Defendants that are here

25 today for sentencing.

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1          There were four people on the boat.  One is the

2   captain, and I have yet to obviously sentence him because he

3   hasn't even gone to trial or pled or whatever he intends to

4   do.  But as far as the three Defendants that are here, I'm not

5   going to impose a minor role for any of them.

6          As far as the obstruction of justice, I think it's an

7   interesting question about the jurisdiction.  I don't think it

8   makes any difference here, but whether jurisdiction just

9   miraculously exists or it exists at the point that you get

10  Colombia in this case to declare this as a stateless vessel or

11  that they're not claiming the vessel, which then, as I

12  understand it, gives the Coast Guard the right to board the

13  vessel according to the law.

14         But at any rate, I don't think it really matters

15  under 3C1.1D.  And let me just read that.  "A Defendant

16  willfully obstructed or impeded or attempted to obstruct or

17  impede administration of justice with respect to the

18  investigation, prosecution, or sentencing of the instant

19  offense of conviction."

20         And I want to read D, which is Application Note 4D.

21  And these are examples of covered conduct.  "Destroying or

22  concealing or directing or procuring another person to destroy

23  or conceal evidence that's material to an official

24  investigation or judicial proceeding, or attempting to do so."

25         And then, "However, if such conduct occurred

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1  contemporaneously with the arrest, it shall not, standing

2  alone, be sufficient to warrant an adjustment for obstruction

3  unless it resulted in a material hindrance to the official

4  investigation or prosecution of the instant offense or the

5  sentencing of the Defendant."

6        In this case, the jettisoning of the cocaine occurred

7  while the Coast Guard aircraft was circling, and the boat had

8  not been boarded.  The Defendants had not been arrested in

9  this matter.  And it was an attempt to get the cocaine off the

10 vessel and sink the cocaine.  And obviously it's difficult to

11 prove a case with no cocaine onboard the vessel.  It can be

12 done, but it is obviously difficult.  So I think this is

13 clearly obstruction of justice under 3C1.1, and I will

14 overrule the objection.

15       As far as the acceptance of responsibility that was

16 raised by one of the Defendants, I think only raised as to

17 Mr. Meighan, I'm going to overrule that objection as well.

18 And I'm going to find that -- you know, he went to trial.  And

19 if I look at the requirements of the acceptance of

20 responsibility and I look at the note which falls under H --

21 no.  I guess it's Application Note 2.  I'm sorry.  It's just

22 2.  "The adjustment is not intended to apply to a Defendant

23 who puts the Government to its burden of proof at trial by

24 denying the essential factual elements of guilt, is convicted

25 and only then admits guilt and expresses remorse."

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1          And then it does say that, "Conviction by trial,

2   however, does not automatically preclude a Defendant from

3   consideration for such a reduction.  In rare situations, the

4   Defendant may clearly demonstrate an acceptance of

5   responsibility for his crime."

6          And then it gives an example.  "For example, a

7   Defendant who goes to trial to preserve issues that do not

8   relate to factual guilt."  And that's not what happened here.

9   So I'm going to overrule that objection and find that he is

10   not entitled to acceptance of responsibility.

11          With Mr. Meighan, that leaves also the safety valve.

12   And the probation officer suggested in the final pre-sentence

13   report that he was entitled to the safety valve.  The

14   Government objects to his receiving the safety valve.  And

15   apparently, Mr. Meighan debriefed five times too after the

16   trial in this matter and prior to sentencing.  And the

17   Government felt that he was not being entirely truthful about

18   his omissions that he was a load guard and not knowing how

19   much he was paid.

20          However, you know, there has been evidence that he

21   told them that he was paid enough to buy a fish camp.  He

22   wanted to buy a fish camp, and he admitted that he knew where

23   the boat was supposed to go into and land, you know, two times

24   after having gone to trial.  I realize the Government is not

25   recommending that he receive a two-level increase.  And if

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1  appropriate and if applicable, statutory minimum and mandatory

2  wouldn't apply, but it would seem to me that he has truthfully

3  debriefed here and he is entitled to the safety valve.  And

4  I'm talking only now about Mr. Meighan.

5        So I am going to overrule the Government's objection

6  to him not receiving the safety valve and find that

7  essentially the probation officer has correctly scored the

8  guidelines as far as Mr. Meighan is concerned.

9        Mr. Newball May.  Mr. Newball May adopted the

10  objections, as I recall, to the amount of drugs, to the minor

11  role, and to the obstruction of justice.  And my rulings would

12  be the same as it relates to Mr. Newball May.  I would

13  overrule the objections.

14        Finally, Mr. Reid-Dilbert.  Mr. Reid-Dilbert had an

15  objection to the base offense level, also had an objection

16  regarding minor role.  And I'm not sure whether or not there

17  was an objection regarding obstruction raised.  I think there

18  was.

19        Mr. Amador, did you raise the obstruction objection?

20        MR. AMADOR:  I did, Judge.  It's in my sentencing

21  memorandum.

22        THE COURT:  Raised in the sentencing memorandum, but

23  my ruling would be the same.  And in this instance, I'm going

24  to sustain the Government's objection regarding the safety

25  valve.  I see a distinct difference between Mr. Reid-Dilbert

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1   and Mr. Meighan.  Mr. Dilbert debriefed prior to going to

2   trial and pled not guilty and denied his guilt and the facts.

3   So I'm going to sustain the Government's objection as it

4   relates to Reid-Dilbert.

5           So those are my rulings on the guideline objections.

6   And I think we can proceed with any other argument you might

7   have regarding sentencing.

8           And I will start with you, Mr. Dee, as it relates to

9   Mr. Meighan.

10          MR. DEE:  Yes, Your Honor.  The Court has made the

11  guideline calculation.  I will try to be brief.  This Court

12  has heard this argument numerous times as far as the

13  guidelines are not mandatory but are a recommendation or a

14  guideline to follow under 18 United States Code 3553.  The

15  Court can look into other factors for variance.  And the goal

16  here is so that we obtain a sentence that is sufficient but

17  not greater than necessary to comply for purposes set forth in

18  Paragraph 2 of that section.

19          I would ask the Court to consider -- this Court, I

20  know in the years that Your Honor has been on this court has

21  handled numerous boat cases of Defendants who have gone to

22  trial.  I would ask that we try to look at that, somewhat

23  close to it.  I realize every boat case has different fact

24  scenarios.  I realize this one has.  The Court has already

25  granted a two-level increase based upon the obstruction.

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1          However, I'd ask that the Court consider a variance

2   because at this point, if I'm correct, I believe you have

3   Mr. Meighan at a level 38, category 1.  I may be wrong.  I was

4   just trying to write numbers down as I was going through.

5          THE COURT:  You're correct.

6          MR. DEE:  That sentence, that guideline would be like

7   235 months to 293 months.  I think that is over, way over more

8   than sufficient to penalize him.  We would ask the Court to

9   depart downward from that and give him a sentence closer to

10  the 15- to 17-year range, not almost 20 years.

11          Thank you, Your Honor.

12          THE COURT:  Mr. DeRenzo, anything you want to say

13  regarding a variance?

14          MR. DeRENZO:  Yes, Your Honor.  I had an argument

15  prepared and I can present it.  It is essentially the same for

16  all three Defendants, and I'm happy to address the Court now.

17          THE COURT:  Okay.

18          MR. DeRENZO:  We are going to be asking for what is

19  accounting for the differences in this case, the same sentence

20  I would ask for in any other case, which is a low end

21  sentence, low end of the guidelines.

22          In Mr. Meighan's case, that's a sentence of 235

23  months.  In the case of his co-Defendants, that's a sentence

24  of no less than 292 months, all of which are followed by five

25  years of supervised release.

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1      I know the Court has seen many of these cases and

2  many of them are very similar.  And I think in particular here

3  in the Middle District of Florida we've just been accustomed

4  to seeing enormous amounts of drugs being trafficked through

5  either the Caribbean or the Eastern Pacific.

6      In a case like this where I'm asking for such a

7  significant sentence, I think it's important to highlight and

8  just step back and recognize what we're talking about, and

9  that's an enormous amount of drugs, I would submit poison

10 that's undoubtedly heading for communities, perhaps even a

11 place like Tampa, Florida.  I think the testimony here today

12 was 760 kilograms.  That's not diluted at the street level in

13 Tampa.  That's wholesale over $20 million.  And to put that in

14 perspective, that's over 150 times threshold for a mandatory

15 minimum of a ten-year sentence.

16     You know, one of the things we talk about in 3553(a)

17 is unwarranted sentencing disparity.  If someone were to get

18 that, to smuggle five or six keys across the Arizona border,

19 Mexico border, they would be -- absent a safety valve or a 5K,

20 they're getting ten years mandatory.  To give somebody even 15

21 years for smuggling over 150 times that amount in my view is

22 unwarranted.

23     I know that the Court is extremely aware of what that

24 amount of drugs can and has done to American families and,

25 frankly, people who are from the communities where these

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1   Defendants come from in South and Central America.  That money

2   that I just talked about, that is used to fuel, unfortunately,

3   violence that's involved in the drug trade.  I'm not asking

4   you to hold these three Defendants accountable for the

5   violence that's committed, but it's just important, I think,

6   to recognize what that amount of money represents.

7          In terms of aggravating facts, this case, we have the

8   obstruction adjustment, and I believe it accurately reflects

9   the aggravating nature of the Defendant's conduct.  They

10  destroyed evidence.  It was intentional.  It was planned.  It

11  was successful.  It lasted hours.  And, frankly, it impacted

12  every stage of the investigation from the minute the Coast

13  Guard showed up to our lengthy sentencing hearing here this

14  morning.

15         Making matters worse, the Defendants all doubled down

16  on the lies they told to the Coast Guard.  And we heard about

17  those throughout the the three days or so of trial and heard

18  more about it here this morning through Special Agent

19  Campbell.  They're not charged with lying to investigators,

20  but those are aggravating facts that the Court should

21  consider, you know, whether they are contrite and come forward

22  and tell the truth to the agents or in this case they persist

23  in the lies until, frankly, they can't lie anymore.

24         In my experience, albeit far less in the courts, in

25  many courtrooms here, Defendants get a low end sentence.  And

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1   what we are asking for here is certainly not to punish the

2   Defendants for going to trial but to recognize the benefit

3   those other people get when they do plead guilty, accept

4   responsibility, fully and truthfully debrief with law

5   enforcement and get the appropriate adjustments under the

6   guidelines.

7           It's our view that that low end sentence is entirely

8   consistent and therefore -- although very significant.  292

9   months or 235 months is a long time.  I recognize that.  But

10  that does -- that's entirely consistent with the vast number

11  of cases we've seen come through the courts here in Tampa.

12          Thank you, Your Honor.

13          THE COURT:  Mr. DeRenzo, let me ask you a question.

14  This may apply to just one.  Hold on just a minute.  I believe

15  Mr. Meighan.  I had heard that some of the Defendants,

16  depending on their, I guess, country where they have their

17  citizenship are being deported prior to finishing their

18  sentence.  Is that true?

19          MR. DeRENZO:  There is an international prisoner

20  transfer program.  I think that runs through main DOJ and the

21  Department of State, and there are agreements in place.

22          With respect to these three Defendants -- so to

23  answer the question from the Court, yes, it does happen from

24  time to time, I would say most frequently with Defendants from

25  Ecuador.

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1          My understanding -- I'm not an expert on that

2   particular subject, but folks from Colombia are not eligible

3   for that program.  I've been told, again I can't verify it is

4   true, Colombia wouldn't even take them if we did have an

5   agreement in place.

6          I'm not sure.  I believe that Belize is on the list

7   of countries that we have a prisoner transfer agreement in

8   place.  I do not know.  I don't have visibility on when and if

9   those kinds of requests are actually favorably viewed.

10          THE COURT:  Thank you.

11          MR. DeRENZO:  Yes, Your Honor.

12          THE COURT:  Okay.  Why don't I ask -- and I will give

13   Mr. Meighan an opportunity to say whatever he would like to

14   say, Mr. Meighan, when you come up, and certainly prior to my

15   imposing sentence.

16          So why don't I ask Mr. Meighan, Mr. Dee, and

17   Mr. DeRenzo, if you'll come up and I'll proceed with the

18   sentencing of Mr. Meighan.

19          Mr. Meighan, is there anything you would like to say,

20   sir?

21          DEFENDANT MEIGHAN:  Yes, Your Honor.  I would just

22   like to ask this Court to give my a favorable sentence and

23   that I'm sorry for whatever trouble I have caused.  Most of

24   the decisions were out of my control.  I'm just asking for you

25   to look into it.

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1          THE COURT:  I'm sorry.  I missed that.  Most of what

2    was out of your control?

3          DEFENDANT MEIGHAN:  Decisions.

4          THE COURT:  Oh, decisions.  Okay.

5          DEFENDANT MEIGHAN:  Yes, ma'am.  And I'm just trying

6    to find a way to get back home to my family.  I also ask if

7    you can look into the transfer.  I know I've seen it while I

8    was in Pinellas County Jail, and Belize is on that list for

9    prisoner transfers.

10         THE COURT:  Actually, I have no control over that.  I

11   don't have any control over who is on the list or when someone

12   gets transferred.  I just knew that it was occurring.  And

13   that's about all I know.  And that's something that happens

14   later.  And I don't know.  Mr. Dee, do you know something

15   about it?  I know no more than I know that it is occurring

16   with respect to some countries.

17         MR. DEE:  And, Your Honor, what I know is about the

18   same as what the counselor stated.  I know some Ecuadorian

19   prisoners have been transferred, and that's all I know.

20         THE COURT:  Why did you do this?  You're an educated

21   guy.

22         DEFENDANT MEIGHAN:  Well, from my understanding, as I

23   stated to the agents, my job was to --

24         THE COURT:  Maybe I shouldn't ask you that.  If he

25   is -- I don't know what he said about appealing or what his

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1  decision is about appealing, and I know he has debriefed.  So

2  if you think that's not appropriate that he answer that

3  question, then I'll just move on.

4       MR. DEE:  I think it would be better if he did not

5  answer that question.

6       THE COURT:  Let me move on.

7       MR. DEE:  Thank you.  I appreciate that, Your Honor.

8       THE COURT:  Is there anything else you would like to

9  say?

10      DEFENDANT MEIGHAN:  No.

11      THE COURT:  Mr. Meighan, on May the 9th, 2019, a jury

12  found you guilty of Count 1 of an indictment.  It charged you

13  with a conspiracy to contribute, possess with the intent to

14  distribute 5 kilograms or more of cocaine while onboard a

15  vessel subject to the jurisdiction of the United States.

16      Count 2 charged you with possession with the intent

17  to distribute 5 kilograms or more of cocaine while onboard a

18  vessel subject to the jurisdiction of the United States.

19      I adjudicated you guilty right after the trial.  You

20  told me that you have been over the pre-sentence report with

21  Mr. Dee.  I too have read the pre-sentence report.  There were

22  a number of objections to facts and guideline calculations in

23  the pre-sentence report, mostly to the guideline calculations,

24  and I have ruled on those objections.  I'm going to adopt the

25  undisputed factual statements and the guideline applications

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1   that are contained in the pre-sentence investigation report.

2        The total offense level is a 38.  Criminal history

3   category is 1.  The range of imprisonment is 235 to 293

4   months.  Five years is the amount of supervised release.

5   There's a fine range of 50,000 to 20 million, and a $200

6   special assessment.

7        Mr. Dee, is there any legal reason why I shouldn't

8   proceed with sentencing?

9        MR. DEE:  No, Your Honor.

10       THE COURT:  Any legal reason, Mr. DeRenzo?

11       MR. DeRENZO:  No, Your Honor.

12       THE COURT:  The Court having asked why judgment

13  should not now be pronounced and no cause being shown to the

14  contrary, having considered the advisory guidelines, having

15  considered Title 18 United States Code Section 3551 and 3553,

16  the factors thereunder, having considered what was said here

17  this morning, it is the judgment of this Court that you be

18  sentenced to a term in the Bureau of Prisons of 235 months to

19  run concurrent as to both of the counts.

20       Following the 235-month sentence, I will place you on

21  a term of supervised release for five years.  It will run

22  concurrent.  You will be deported.  You will not be allowed to

23  re-enter the United States without the expressed permission of

24  the appropriate governmental authority.  You will have to

25  cooperate in the collection of DNA by the probation office,

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1   submit to random drug testing should it be requested.  I will

2   waive the fine, assess the $200 special assessment which I

3   cannot waive.

4          As I said, I have considered the 3553 factors and

5   find there is no reason to vary from the guideline

6   calculations.

7          Mr. Dee, do you have any objections to the sentence

8   or the manner in which it was imposed other than those you

9   might have raised?

10         MR. DEE:  No additional objections other than the

11  ones previously raised.

12         THE COURT:  Mr. DeRenzo?

13         MR. DeRENZO:  No, Your Honor.

14         THE COURT:  Then I will remand you to the custody of

15  the United States Marshal to await a designation.  Do you have

16  any request?

17         MR. DEE:  Judge, he does have some family, in fact an

18  aunt that lives locally.  So I guess Coleman would probably be

19  the closest.

20         THE COURT:  I will recommend Coleman.  Any other

21  recommendations?

22         MR. DEE:  Judge, I think the pre-sentence report

23  stated that he's had marijuana usage for quite some time.  I

24  ask the Court to recommend a drug treatment program.

25         THE COURT:  Anything else?

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1          MR. DEE:  No, Your Honor.

2          THE COURT:  I will recommend that.  I will also note

3    that he was paroled into the United States and didn't come in

4    here voluntarily and recommend that he be able to participate

5    in any vocational or work programs that are available in the

6    prison system that he might be interested in.

7          MR. DEE:  Thank you, Your Honor.

8          THE COURT:  You have the right to appeal.  You have

9    the right to appeal the judgment and the sentence.  Any notice

10   of appeal must be filed within 14 days or it's waived.  You

11   are entitled to a court-appointed attorney in the appeal, and

12   I would instruct the clerk to waive the filing fee.

13         Do you have any questions about that?

14         DEFENDANT MEIGHAN:  No, Your Honor.

15         THE COURT:  All right.  I will remand you to the

16   custody of the United States Marshal.

17         Thank you.

18         Mr. Brunvand, I know you filed a sentencing

19   memorandum.  Is there anything you would like to say regarding

20   sentencing in this matter?

21         MR. BRUNVAND:  Yes, Your Honor.  If I could elaborate

22   a little bit.  Your Honor, in my sentencing memo, I proposed a

23   120-month, 10-year sentence, the minimum sentence allowed

24   under these types of cases would be sufficient and not greater

25   than necessary considering the 3553 factors.

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1           I recognize that in light of the 235-month sentence

2    of the co-Defendant and observations by the Court today that

3    you find the three of them to be very much in a similar

4    position, that the Court is very unlikely to grant my wish of

5    120 months or ten years.  But I would like to just briefly

6    discuss how it is that I come up with that number and the

7    reasons why.

8           We heard from Agent Campbell today.  It was brought

9    out by the Government the value of the cocaine in this

10   particular case which exceeded $22 million local wholesale

11   values in the Tampa Bay area.  We also heard from him that

12   that basically is the equivalent of one-tenth of 1 percent as

13   far as the amount of money that my client was paid or would be

14   paid if it was successful.  I think he was paid half and would

15   be paid the other half at a later time.  Obviously the second

16   half did not happen and will not happen.

17          Even though the minor role argument is an argument we

18   argue for purposes of, you know, what the sentencing

19   guidelines should be, I think it is appropriate for the

20   Court -- and I respect the Court's rulings on all those

21   issues, but I think it's appropriate to look at all those

22   issues for the purpose of 3553 factors.

23          And we know, Your Honor, that over the past 20 years

24   there has been a number of these cases that have come before

25   the Court.  Some cases have gone to trial.  Some cases -- the

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1  vast majority of the cases end up with pleas, pleas that

2  include acceptance of responsibility and a waiver of the

3  appeal.

4          The overwhelming, I would say a large percentage of

5  those cases end up with a sentence of 11 years, 3 months.

6  That seems to be the standard, the 135 months on the plea

7  cases.

8          We also have seen -- we didn't see it early on, but

9  the second decade, I guess, that we have seen these cases come

10  into this area, we've seen extradition cases.  We've seen sort

11  of the bigger players, the people that orchestrate and do

12  everything in Colombia and people that generally engaged in

13  cooperation, and significantly so, and not at all unusual to

14  see people like that come in and actually be sentenced to less

15  than ten years after having cooperated.

16          So taking all of those factors into consideration,

17  Your Honor, is the reason why I was proposing a ten-year

18  sentence would be appropriate.  It's also understanding that

19  the Court is not likely to go along with that, 235 months,

20  which is the sentence that was imposed for Mr. Meighan, is

21  basically 100 months in excess of the standard sentence, that

22  is the 135 months.  And I would propose, Your Honor, that if

23  the Court is not inclined to give anything less than 235

24  months, that certainly anything more than 235 months would be

25  far in excess of what's necessary in this type of a case.

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1          And keeping also in mind -- the Court brought up the

2   issue of the international prisoner transfer treaty.

3   Unfortunately, even though the majority of the people who are

4   here in these types of cases are from Colombia, they do not

5   have the treaty and they will serve their time here in the

6   United States.  And so, Your Honor, I would ask the Court to

7   consider that in determining what would be a fair and an

8   appropriate sentence considering all the factors and the

9   history of these types of cases.

10          THE COURT:  Mr. DeRenzo, do you want to add anything?

11          MR. DeRENZO:  No, Your Honor.  Thank you.  I've

12   already addressed it in my previous argument.

13          THE COURT:  Okay.  Mr. Brunvand brought up one

14   additional issue.  I just sentenced Mr. Meighan to 235 months.

15   Is there any reason I should sentence Mr. Newball May to a

16   sentence that's different than that or more than that?

17          MR. DeRENZO:  Yes, Your Honor.  Again, we would ask

18   for the low end of his guidelines.  And what that accounts for

19   is the lack of safety valve.  Certainly Mr. Newball May is

20   under no obligation to debrief with federal agents,

21   particularly if he maintains his innocence, but there has to

22   be a benefit for that, and the guidelines have accounted for

23   that.  And congress has certainly accounted for it in the

24   statutory safety valve provision.

25          So my view as to give him the same sentence as

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1   Mr. Meighan, given the Court's ruling on the safety valve,

2   would create an unwarranted sentencing disparity.  So he would

3   be -- where Mr. Meighan is getting the benefit for his

4   debriefing with the United States, Mr. Newball May would get

5   the same sentence, as would Mr. Reid-Dilbert, for not

6   fulfilling that important criteria.

7          THE COURT:  I have one other question to ask.

8   Suppose the captain, Mr. Hinestroza-Newbbooll, does go to

9   trial, which apparently he is saying he is, do you intend to

10  call any of these Defendants as witnesses or do you know now?

11         MR. DeRENZO:  Not at this time, Your Honor.

12         THE COURT:  Not at this time you don't know or not at

13  this time you don't intend to call them?

14         MR. DeRENZO:  The latter, Your Honor.  I do not

15  intend to call them.

16         Thank you, Your Honor.

17         MR. BRUNVAND:  Could I very briefly respond?

18         THE COURT:  Yes.

19         MR. BRUNVAND:  Your Honor, the only thing I would

20  point out, there is a distinction that would make it okay to

21  keep the sentence the same.  And that is the reason that the

22  Government was arguing against the safety valve was that he

23  was a load guard, that he was the connection between the

24  source of who would be receiving the drugs.  And so that is

25  certainly -- I don't know what factors the Court considered,

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1  but I would suggest that that would be a reason to keep the

2  sentence the same for all three.

3          THE COURT:  Well, I don't know that that was what

4  they were arguing.  It was my understanding they were arguing

5  that he didn't truthfully debrief about being the load guard.

6          MR. BRUNVAND:  Correct.  Correct.  That's what I

7  meant, that he wasn't truthful about it.  But him being a load

8  guard, I would suggest, puts him slightly above the other two

9  members that are in this courtroom today and that's a factor

10  for the Court to consider in evaluating the sentence.

11          THE COURT:  If you will come forward then, I will

12  impose sentencing up here.  The interpreter will probably need

13  to come up as well.

14          Is there anything, Mr. Newball May, that you would

15  like to say before I impose sentence?

16          DEFENDANT NEWBALL MAY:  Yes, Your Honor.  I would

17  like to ask Mr. DeRenzo if he has a family or not.  He is

18  being very harsh against us.  I have a mother who is ill, a

19  brother who has got schizophrenia, and a five-year-old

20  daughter.  And I don't believe that a sentence of 235 months

21  would be fair to us.  It's not fair.  If he can read

22  Leviticus 19 and judge us the right way not because we are

23  stranger here.  I think that is the unjust punishment and end

24  up with nothing, whatever.  That's all I want to say.

25          THE COURT:  Actually, the guidelines are more than

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1  that.  You said you didn't think 235 months was fair.  The

2  guidelines are actually 292 months at the low end.

3       Mr. Newball May, on May the 9th, 2019, a jury found

4  you guilty of Count 1 of the indictment, charged you with a

5  conspiracy to distribute and possess with the intent to

6  distribute 5 kilograms or more of cocaine while onboard a

7  vessel subject to the jurisdiction of the United States.

8       Count 2 was the substantive charge of possession with

9  the intent to distribute 5 kilograms or more of cocaine while

10 onboard a vessel subject to the jurisdiction of the United

11 States.

12      You have told me you have been over the pre-sentence

13 report with Mr. Brunvand.  I too have read the pre-sentence

14 report.  There were a number of objections which I have ruled

15 on.  And I am going to adopt the facts and the guideline

16 calculations as they are contained in the pre-sentence report.

17      The total offense level is 40.  The criminal history

18 category is 1.  The range of imprisonment, 292 to 365 months,

19 five years of supervised release.  50,000 to 20 million is the

20 fine rage.  I'm not imposing a fine.  And there is a $200

21 special assessment.

22      Mr. Brunvand, is there any legal reason why I

23 shouldn't proceed with sentencing?

24      MR. BRUNVAND:  No, Your Honor.

25      THE COURT:  Mr. DeRenzo?

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1          MR. DeRENZO:  No, Your Honor.

2          THE COURT:  The Court having asked why judgment

3    should not now be pronounced and no cause being shown to the

4    contrary, having considered those guidelines, having

5    considered Title 18 United States Code Sections 3551 and 3553,

6    it is the judgment of this Court that you be sentenced to a

7    term in the Bureau of Prisons of 235 months.  And I am varying

8    downward.

9          And I realize that that creates some discrepancy as

10   far as the safety valve with the last Defendant.  Frankly, I

11   think that's a sentence that's sufficient but not greater than

12   necessary.  And I'm not sure other than the debriefing whether

13   or not I should impose any sentence any different for that

14   Defendant as I did for this Defendant.  And I just don't think

15   that a sentence of 292 months is necessary in this case.  So I

16   am going to impose a sentence of 235 months, which I again

17   find is sufficient but not greater than necessary.  It is a

18   variance downward.  And I will run it concurrent to both

19   counts.

20         Upon release from imprisonment, I will place you on a

21   term of supervised release for five years.  I will run those

22   concurrent as to both counts.  You will have to comply with

23   the standard conditions adopted by the Middle District of

24   Florida.  You'll be deported.  You will not be allowed to come

25   back into the United States without the expressed permission

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1  of the appropriate governmental authority.  You will have to

2  cooperate in the collection of DNA by the probation office,

3  submit to random drug testing not to exceed 104 tests per

4  year.  I will waive the fine, assess the $200 special

5  assessment, which I cannot waive, and it is due and payable

6  immediately.  In addition, I have considered the 3551 and

7  3553 factors in imposing this sentence.

8          Mr. Brunvand, do you have any objections to the

9  sentence or the manner in which it was imposed other than

10  those you might have raised?

11          MR. BRUNVAND:  No, Your Honor.

12          THE COURT:  Mr. DeRenzo?

13          MR. DeRENZO:  No, Your Honor.

14          THE COURT:  I'm going to remand you back to the

15  custody of the United States Marshal to await a designation.

16          You have the right to appeal both the judgment and

17  the sentence in this case.  Any notice of appeal must be filed

18  within 14 days or it's waived.  You are entitled to a

19  court-appointed attorney in your appeal, and I would instruct

20  the clerk to waive any kind of fees or filing fees.  And

21  obviously I varied downward.  So the Government is entitled to

22  appeal as well.

23          Any recommendations?

24          MR. BRUNVAND:  We would ask for Coleman as a

25  recommendation, Your Honor.

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1          THE COURT:  I will recommend Coleman.  I will also

2    note that you were paroled into the United States and

3    recommend that you be able to participate in work programs or

4    vocational programs which you might be interested in.

5          MR. BRUNVAND:  Thank you, Your Honor.

6          THE COURT:  All right.  Thank you.

7          MR. BRUNVAND:  Your Honor, may I be excused?

8          THE COURT:  Yes.

9          Mr. Dilbert is next, I believe.

10          Mr. Amador?

11          MR. AMADOR:  Judge, I would adopt Mr. Brunvand's

12    argument, if you will, about the nature of these individuals

13    and how the mid tier people have come, that part of the

14    argument.  Not so much the argument with respect to the load

15    guard because, frankly, in this day and age I don't think

16    there is a distinction.  I think it's just a guy that's hired

17    to count bales.

18          That being said, Judge, in this case three of the

19    four people debriefed with the Government.  And all of a

20    sudden something changed.  And I think that I would ask the

21    Court to consider that just because --

22          THE COURT:  Well, I would if I knew what caused it to

23    change.

24          MR. AMADOR:  Well, I wish I could tell you.  But

25    clearly I believe that there are other forces at work, if you

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1   will.  And so I think that's something that the Court should

2   consider.

3        I would say that Mr. Dilbert is -- Mr. Reid-Dilbert

4   has a little bit more education than most people in the case,

5   in these types of cases.  However, he has a horrible -- in his

6   words, a terrible back story.  It's, you know, his family

7   didn't want him.  I mean, it's as sad as most other ones.  And

8   then we add the whole idea of, you know, his mother having

9   been -- his belief that his mother had cast a spell.  So I

10  think those are factors that the Court should consider.

11       Mr. Dilbert should receive, as I asked and as

12  Mr. Brunvand asked, receive the minimum mandatory sentence.

13  That's my request from the Court based on my sentencing memo,

14  based on what I have seen here and the reality of what you

15  have just sentenced his co-Defendants to.  Certainly it

16  appears that the Court is going to impose a sentence of 235

17  months, which we prefer rather than the guideline sentence,

18  obviously.  But I would ask that the Court consider that, the

19  arguments that I've made.

20       Thank you.

21       THE COURT:  Mr. DeRenzo, do you have anything else?

22       MR. DeRENZO:  No, Your Honor.

23       THE COURT:  All right.  If you will come forward, I

24  will impose sentence up here.

25       Mr. Reid-Dilbert, is there anything you would like to

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1   say, sir, either in English or Spanish?

2           DEFENDANT REID-DILBERT:  Señora, I want to tell you

3   something.  In my time when I come up, I suffered a lot, you

4   know.  My mother, damage my mother.  My wife, she very sick

5   right now.  She have operate and she have a big thing here.

6   Operate, where they operating, she affect because she sore and

7   heat from the machine hurt my wife.  So she stands here with a

8   big right there.  Trouble with -- trouble with pressure,

9   trouble with gastric.  She alone there right now.  She suffer

10  there.  I know I suffer a lot too.  I pass a very hard time.

11  And I think this consideration is very too high.  And I don't

12  want to do and I not do that.  I ask the guy at the port but I

13  never got that in my mind.  Thank you for what took place and

14  a part of me for what took place.  I have a very hard time up

15  to now, suffer.

16          I pray for you every night, everybody.  I pray to God

17  to help me, to help everyone.  I pray for you every night.  I

18  pray for everybody for survival in this world, everything.

19          THE COURT:  Thank you.

20          Mr. Reid-Dilbert, on May 9 a jury found you guilty

21  and I adjudicated you guilty of conspiracy to contribute,

22  possess with the intent to distribute 5 kilograms or more of

23  cocaine while onboard a vessel subject to the jurisdiction of

24  the United States.

25          And they also found you guilty of Count 2, which is

1   possession with the intent to distribute 5 kilograms or more

2   of cocaine while onboard a vessel subject to the jurisdiction

3   of the United States.

4         You've told me you have been over the pre-sentence

5   report.  I too have read the pre-sentence report.  There were

6   a number of objections which I have ruled on.  In this

7   particular instance, I am going to find that based on my

8   overruling the safety valve in this case, the total offense

9   level is 40.  The criminal history category is 1.  And the --

10  I'm sorry.  What is the total -- I may be wrong on that.  What

11  is the total offense?

12        PROBATION OFFICER:  You are correct with the total

13  offense level and the criminal history category.

14        THE COURT:  And then the range of imprisonment would

15  be?

16        PROBATION OFFICER:  292 to 365, Your Honor.

17        THE COURT:  Thank you.

18        292 to 365.  Five years of supervised release, a fine

19  range of 50,000 to 20 million, and I'm not imposing a fine.

20  And a $200 special assessment.

21        Mr. Amador, is there any legal why I shouldn't

22  proceed with sentencing?

23        MR. AMADOR:  There is none.

24        THE COURT:  Mr. DeRenzo?

25        MR. DeRENZO:  No, Your Honor.

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1          THE COURT:  The Court having asked why judgment

2    should not now be pronounced and no cause being shown to the

3    contrary, having considered the advisory guidelines, having

4    considered Title 18 United States Code Section 3553 and 3551,

5    the factors thereunder, it is the judgment of this Court that

6    you be sentenced to a term in the Bureau of Prisons of 235

7    months.  That is a variance downward.  I will run that

8    concurrent as to each of the counts.

9          And I'm varying downward because I think that's a

10   sentence that is sufficient but not greater than necessary.  I

11   will follow it with a term of five years of supervised release

12   to run concurrent as to both counts.  You will be deported.

13   You will not be allowed to come back into the United States

14   without the expressed permission of the appropriate

15   governmental authority.

16         You will have to cooperate in the collection of DNA

17   by the probation office, submit to random drug testing should

18   it be requested, not to exceed 104 tests per year.  Waive the

19   fine.  There is no forfeiture in this case.  I will assess the

20   $200 special assessment, which I cannot waive.

21         The Court having pronounced sentence, Mr. Amador, do

22   you have any objections to the sentence or the manner in which

23   it was imposed other than those you have raised?

24         MR. AMADOR:  No, Judge.

25         THE COURT:  Mr. DeRenzo?

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1          MR. DeRENZO:  None, Your Honor.

2          THE COURT:  You have the right to appeal the judgment

3    and the sentence that I have just imposed.  Any notice of

4    appeal must be filed within 14 days or it's waived.  You are

5    entitled to an attorney in that appeal, and I would instruct

6    the clerk to waive the filing fee.  The Government is also

7    entitled to appeal.  I have varied downward.

8          Any recommendations, Mr. Amador?

9          MR. AMADOR:  Judge, I would say Coleman would be

10   great, somewhere where he can participate in a UNICOR program.

11   And I would ask that you recommend that he receive education

12   in English, and he would like to get involved in whatever

13   vocational trades there are.  He did previously attend The

14   Center, which is a vocational school in Colombia for

15   carpentry.  So whatever is available, he would like to take

16   advantage of it.

17         THE COURT:  I will recommend Coleman.  And I will

18   also recommend that you be able to participate in the UNICOR

19   program or work program.  And I will note it that you were

20   paroled into the United States rather than coming in here

21   intentionally, I suppose.

22         In addition, I will recommend vocational training.

23   And vocational training could be carpentry or perhaps

24   something else that you are interested in.  And I will also

25   recommend English classes for Spanish speakers.

CROSS EXAMINATION OF TIMOTHY CAMPBELL

1              Thank you.

2              MR. AMADOR:  Judge, I just remembered he did ask in

3    the pre-sentence report for some training in business

4    administration.

5              THE COURT:  And I will recommend that as well.

6              Thank you.

7              MR. AMADOR:  Thank you, Judge.

8         (Proceedings concluded at 12:02 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CROSS EXAMINATION OF TIMOTHY CAMPBELL

```
1 │ UNITED STATES DISTRICT COURT    )
  │                                 )
2 │ MIDDLE DISTRICT OF FLORIDA      )
  │
3 │
  │              REPORTER TRANSCRIPT CERTIFICATE
4 │
  │        I, Tracey Aurelio, Official Court Reporter for the United
5 │ States District Court, Middle District of Florida, certify,
  │ pursuant to Section 753, Title 28, United States Code, that
6 │ the foregoing is a true and correct transcription of the
  │ stenographic notes taken by the undersigned in the
7 │ above-entitled matter (Pages 1 through 123 inclusive) and that
  │ the transcript page format is in conformance with the
8 │ regulations of the Judicial Conference of the United States of
  │ America.
9 │
  │
10│                                /s    Tracey Aurelio
  │                                _____
11│                                Tracey Aurelio, RMR, RDR, CRR
  │                                Official Court Reporter
12│                                United States District Court
  │                                Middle District of Florida
13│                                Tampa Division
  │                                Date:  September 19, 2019
14│
  │
15│
  │
16│
  │
17│
  │
18│
  │
19│
  │
20│
  │
21│
  │
22│
  │
23│
  │
24│
  │
25│
```